720 So.2d 359 (1998)
The PARISH OF JEFFERSON, The East Jefferson Park and Community Center and Playground District of the Parish of Jefferson and the Jefferson Parish Council
v.
The LAFRENIERE PARK FOUNDATION, et al.
No. 98-C-345.
Court of Appeal of Louisiana, Fifth Circuit.
September 15, 1998.
Writ Denied October 28, 1998.
*361 Robert T. Garrity, Jr., Richard E. Anderson, Harahan, Louisiana, for Lafreniere Park Foundation, Thomas G. Chambers, II and Carol Berlier, in their representative capacities.
A. Bruce Netterville, Gretna, Louisiana, for Thomas G. Chambers, II and Carol Berlier, in their representative capacities.
Thomas P. Anzelmo, Metairie, Louisiana, for respondents The Parish of Jefferson, et al.
Panel composed of Judges H. CHARLES GAUDIN, JAMES L. CANNELLA and THOMAS F. DALEY.
CANNELLA, J.
In this Writ Application, the relators, The Lafreniere Park Foundation (the Foundation), Thomas G. Chambers, III (Chambers), President of the Foundation, and Carol Berlier *362 (Berlier), Executive Director of the Foundation, contest a judgment finding them in contempt of court for failing to abide by a consent judgment.
On October 22, 1996, suit was filed by the respondents, The Parish of Jefferson (the Parish), The East Jefferson Park and Community Center and Playground District of the Parish of Jefferson and the Jefferson Parish Council against the relators for mismanagement of funds. A Temporary Restraining Order (TRO) freezing the Foundation's money was issued. A hearing on the preliminary injunction was continued several times and the TRO extended. As a result, relators sought relief from this court, which denied supervisory writs. In January of 1997, the Louisiana Supreme Court granted writs and ordered the trial court to hold a hearing on the preliminary injunction on January 24, 1997.[1]
On January 24, 1997, the parties entered into a consent judgment, which was read into the record of the court. It states:
All funds and assets held in control by Lafreniere Park Foundation shall only be expended on Lafreniere Park in the normal and lawful business and operating expenses of the Foundation, including professional fees that were capable of being expended prior to August 28th, 1996. The sum of $325,00 will be reserved exclusively for part [sic] expenditures.
And I believe the third item is this case is set for trial on the merits February 27th at 9:00.
The trial was continued and the TRO dissolved. The consent judgment was never reduced to writing and the case was not heard on February 27, 1997. After several continuances, the case was eventually heard on November 14, 1997 and judgment was read and rendered on that date and signed on November 19, 1997. Therein the trial judge granted a declaratory judgment in favor of respondents, ruling that the funds and assets held or controlled by the Foundation were to be expended only on Lafreniere Park. That judgment also ordered that all funds and assets presently held or controlled by the Foundation be transferred into the registry of the court within seven days of the trial and that the Foundation submit all books and records to the Parish for an accounting to be prepared by the Parish and submitted to the court. The judgment also permanently enjoined relators from disbursing any funds to any organization, charitable or otherwise, other than to the Parish for the benefit of Lafreniere Park. A second judgment was rendered in response to a Writ of Quo Warranto previously filed by respondents. The writ was issued, declaring that the amendments made by relators to the Articles of Incorporation of the Foundation which changed the stated purpose of the Foundation were null and void. [Relators filed appeals from both judgments, which were affirmed by this court in The Parish of Jefferson, et al. v. Lafreniere Park Foundation, et al., No. 98-CA-146 c/w 98-CA-147 (La.App. 5th Cir. 7/28/98), 716 So.2d 472.]
On November 24, 1997, the Foundation deposited three checks into the court registry in the total amount of $49,020.95.[2] As a result, in December of 1997, the respondents filed a Motion for Contempt against relators for violating the consent judgment of January 24, 1997. Respondents alleged that under the agreement, relators were to reserve $325,000 for park expenditures and that relators had not expended any money since the agreement on the park. They contended that relators should have deposited an additional $276,159.05 in the court registry, in conformity with the January 24, 1997 consent judgment and the November of 1997 judgment.
*363 A hearing on the contempt motion was partially held on January 26, 1998 and completed on March 9, 1998. In February, relators discovered that respondents intended to call Chambers and Berlier to testify at the hearing. Chambers and Berlier objected, asserting that they would assert their Fifth Amendment right against self-incrimination. The trial judge ruled that respondents could call Chambers and Berlier to the stand as witnesses against each other and that she, the trial judge, would decide the Fifth Amendment issue on a question by question basis. Chambers and Berlier filed a writ application in this court. We found the issue to be premature. The Parish of Jefferson, et al. v. Lafreniere Park Foundation, et al., 98-C-228, (La.App. 5th Cir. 2/26/98). The Louisiana Supreme Court also denied writs, without comment. The Parish of Jefferson, et al. v. Lafreniere Park Foundation, et al., 98-0589 (La.3/9/98), 712 So.2d 858.
During the contempt hearing, when Chambers and Berlier were called to testify, a blanket objection was made based on each witness's right against self-incrimination. The trial judge overruled the blanket objection. Both Chambers and Berlier were questioned, without further objection.
Following the contempt hearing, the trial judge found the Foundation to be in contempt of court for failing to produce certain documents as mandated by the November 14, 1997 and December 16, 1997 orders. The trial judge fined the Foundation $500 for each contempt, for a total of $1000 and ordered the Foundation to perform acts to be determined by the Court at a later hearing and to replace the funds that were depleted by a method to be determined at that later hearing set for March 27, 1998. The trial judge also found Chambers and Berlier individually to be in contempt of court for "knowingly violating" the January 24, 1997 consent agreement and fined each one $500. In addition, the trial judge ordered all Bingo proceeds, except for $2,500, to be deposited in the court registry and no other Bingo funds to be withdrawn from the Bingo account for any reason.
The Foundation, Chambers and Berlier filed an application for supervisory writs complaining that the trial judge erred in finding them in contempt of court. They argue that the agreement read into the record was not a judgment, but a contract that respondents breached by continuing the matter past the February trial date. Thus, they argue that the contempt articles do not apply and respondents have no cause of action for contempt. Second, they argue that they did not violate the November judgment because they deposited the funds that were in their control, as ordered. Third, relators assert that the trial judge erred in forcing them to testify over their blanket objections, in violation of their right against self-incrimination under the U.S. Constitution and the Fifth Amendment. Fourth, relators assert that the trial judge erred in ordering the Bingo proceeds to be paid into the court registry, in violation of La.R.S. 33:4861.5, the charitable Bingo and Keno licensing law.
A. APPLICABILITY OF THE CONTEMPT REMEDY
La.C.C. art. 3071 provides that:
A transaction or compromise is an agreement between two or more persons, who, for preventing or putting an end to a lawsuit, adjust their difference by mutual consent, in the manner which they agree on, and which every one of them prefers to the hope of gaining, balanced by the danger of losing. This contract must be either reduced into writing or recited in open court and capable of being transcribed from the record of the proceeding. The agreement recited in open court confers upon each of them the right of judicially enforcing its performance, although its substance may thereafter be written in a more convenient form. (Emphasis added.)
Once a consent agreement has been read into the record, it becomes a legal judgment, even if the agreement is not reduced to writing. As a final, valid judgment, such an agreement may be punished by contempt. Alagdon v. Guertin, 97-0235 (La.App. 4th Cir. 10/1/97), 701 So.2d 480, 482. As the agreement read into the record in this case is a legal judgment, the proceedings for contempt are applicable. Thus, respondents are *364 afforded a cause of action for contempt of court.
Relators also complain that the trial date was a condition of the agreement and that respondents breached this agreement by causing the trial date to be continued so many times that they were forced to incur large legal expenses. Thus, they argue, the trial court erred in finding them in contempt of court and the agreement should be rescinded.
Whether respondents breached the agreement is not pertinent for the purpose of the contempt proceedings. The contempt hearing only involves the issue of whether relators violated the court order. Thus, recission is not a remedy here. In addition, we note that the record reflects that relators did not object to the continuances.

B. LEGAL ANALYSIS OF CONTEMPT
Contempt proceedings in civil cases are regulated by La.C.C.P. art. 221-227 and La. R.S. 13:4611. La.C.C.P. art. 224 states:
A constructive contempt of court is any contempt other than a direct one.
Any of the following acts constitute a constructive contempt of court:
(2) Wilful disobedience of any lawful judgment, order, mandate, writ, or process of the court
La.C.C.P. art. 227 provides that "a person may not be adjudged guilty of a contempt of court except for misconduct defined as such, or made punishable as such, expressly by law."
The punishment which a court may impose upon a person adjudged in contempt of court is provided in La.R.S. 13:4611, as follows:
Except as otherwise provided by law:
(1) The supreme court, the courts of appeal, the district courts, family courts, juvenile courts and the city courts may punish a person adjudged guilty of contempt of court therein, as follows ...
(d) For any other contempt of court ... by a fine of not more than five hundred dollars, or imprisonment for not more than three months, or both.
To find a person guilty of constructive contempt, the trial court must find that he or she violated the order of court intentionally, knowingly and purposefully, without justifiable excuse. In reaching this decision, the trial court is vested with great discretion. City of Kenner v. Jan P. Jumonville, Placide, 97-125 (La.App. 5th Cir. 8/27/97), 701 So.2d 223, 230, writ denied, 97-2890 (La.1/30/98), 709 So.2d 718; Brunet v. Magnolia Quarterboats, Inc., 97-187 (La.App. 5th Cir. 3/11/98), 711 So.2d 308, 313; Reeves v. Thompson, 95-0321 (La.App. 4th Cir. 12/11/96), 685 So.2d 575, 579.
Proceedings for contempt must be strictly construed and the law does not favor extending their scope. Estate of Graham v. Levy, 93-0636, 93-0134 (La.App. 1st Cir. 4/8/94), 636 So.2d 287, 290, writ denied, 94-1202 (La.7/1/94), 639 So.2d 1167. Furthermore, contempt proceedings are designed for the vindication of the dignity of the court rather than for the benefit of a litigant. Nungesser v. Nungesser, 558 So.2d 695, 701 (La.App. 1st Cir.1990).
A contempt proceeding incidental to a civil action is civil in nature, if the purpose is to force compliance with a court order, but it is criminal if the trial judge's primary purpose in imposing the sentence is to punish disobedience of a court order. State in Interest of R.J.S., 493 So.2d 1199, 1202-1203 (La.1986); Legrand v. Legrand, 455 So.2d 705, 709 (La.App. 5th Cir.1984); Coleman v. Caddo Parish School Bd., 25,617 (La.App. 2nd Cir. 3/31/94), 635 So.2d 1238, 1263; HCNO Services, Inc. v. Secure Computing Systems, Inc., 96-1693 (La.App. 4th Cir. 4/23/97), 693 So.2d 835, 845. If it is a criminal contempt, the standard of proof is "beyond a reasonable doubt." State in Interest of R.J.S., (La.1986), 493 So.2d at 1202-1203. In addition, the standard for appellate review is whether the evidence, viewed in the light most favorable to the prosecution, was sufficient for a rational trier of fact to conclude that every element of the crime of which defendant was convicted was proved beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State in Interest of R.J.S., (La.1986), 493 So.2d at 1202-1203. In a civil contempt, *365 the stringent criminal burden of proof and standard for appellate review do not apply.
The burden of proof for civil contempt is by a preponderance of the evidence and appellate review is by the manifestly erroneous standard. State v. Taylor, 554 So.2d 232, 233 (La.App. 2nd Cir.1989). In determining whether the parties intentionally, knowingly and purposefully, without justifiable excuse, violated the November 14, 1997 court order, the trial judge is vested with great discretion. Brunet v. Magnolia Quarterboats, Inc., 97-187 (La.App. 5th Cir. 3/11/98), 711 So.2d 308.

B. NATURE OF THE CONTEMPT
In this judgment, the trial judge ordered the Foundation to pay a fine, but also ordered compliance with the November 14, 1997 court order. Although she only fined Chambers and Berlier in the judgment, she states in her reasons for judgment that "The goal of this Court is to have those funds rightfully restored." Thus, her intent was to have the funds restored and to force compliance with the judgment rendered on November 14, 1997. Thus, we find that the contempt proceedings were civil in nature.

C. SELF-INCRIMINATION
Before we can address the merits of the contempt finding against Chambers and Berlier, we must decide if they were called to testify in violation of their Fifth Amendment right against self-incrimination.
Both the United States Constitution and the Louisiana Constitution provide a privilege against self-incrimination. U.S. Const., Amend. V; La. Const. Art. 1 Sec. 16. State v. Larpenteur, 93-1424 (La.App. 4th Cir. 4/28/94), 636 So.2d 1103, 1106. "The language of the Fifth Amendment, applicable to the States by operation of the Fourteenth Amendment, is unequivocal and without exception". In Re Gault, 387 U.S. 1, 47-48, 87 S.Ct. 1428, 1454, 18 L.Ed.2d 527 (1967). It can be claimed in any type of proceeding, whether it is civil, criminal, administrative, judicial, investigatory or adjudicatory. In Re Gault, 387 U.S. 1, 87 S.Ct. at 1454; Murphy v. Waterfront Commission, 378 U.S. 52, 94, 84 S.Ct. 1594, 1611, 12 L.Ed.2d 678 (1964). It protects any disclosures which the witness may reasonably apprehend could be used in a criminal prosecution or which could lead to other evidence that might be so used. In Re Gault, 387 U.S. 1, 87 S.Ct. at 1454; Murphy v. Waterfront Commission, 378 U.S. 52, 84 S.Ct. at 1611; Kastigar v. United States, 406 U.S. 441, 444, 92 S.Ct. 1653, 1656, 32 L.Ed.2d 212 (1972).
The privilege allows the accused in a trial to refuse to take the stand, but generally a witness may only assert the privilege question by question. State v. Brown, 514 So.2d 99, 110 (La.1987); State v. Larpenteur, 636 So.2d at 1106. However, the witness is not required to take the stand if it "is evident from the implication of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result." State v. Brown, 514 So.2d at 110. Generally, this rule has been applied in criminal cases. We find that it is applicable here because the privilege is not restricted to criminal cases.
In this case, the relators were both accused parties and witnesses. It was not necessarily evident before the testimony that the questions asked Chambers or Berlier, in their capacity as a witness, would necessarily result in injurious disclosures as to accusations of contempt against them. Thus, they were required to invoke the privilege on a question by question basis. They did not do so and thereby waived the privilege.
In addition, even if relators should not have been forced to take the stand, the trial judge's decision is not automatically subject to reversal. "All constitutional errors are not structural and indeed, most are amenable to harmless error analysis." Sullivan v. Louisiana, 508 U.S. 275, 278-279, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993); State v. Hongo, 96-2060 (La.12/2/97), 706 So.2d 419, 421. The analysis for determining harmless error is whether the verdict actually rendered in this case was surely unattributable to the error. State *366 v. Batiste, 96-1010 (La.App. 5th Cir. 1/27/98), 708 So.2d 764, 772.
Here, Chambers testified that he was not privy to the terms of the agreement and that he did not knowingly or wilfully violate the judgment. Berlier testified that she had never seen the agreement, although she knew that the Foundation was supposed to reserve $325,000 for park expenditures. However, she further testified that she believed the expenditures made from January 24, 1997 until November 21, 1997, when the Foundation deposited the remaining funds in the court registry, were proper. In addition, Berlier stated that she and the Board members of the Foundation relied upon the advice of counsel that the expenditures were ordinary operating expenses for the park. Thus, "the verdict actually rendered in this case was surely unattributable to the error." State v. Batiste, 708 So.2d at 772.

D. EVIDENCE ON THE MERITS
During the trial, evidence was produced that the Board members of the Foundation expended a one time payment of $143,250.72 to purchase an annuity to fund Berlier's salary for five years and spent more than $100,000 in legal fees between the date of the agreement on January 24, 1997 and the deposit into the court registry on November 21, 1997. The Foundation was represented by Robert Garrity (Garrity) and Richard Anderson.
Philip Rebow, a Certified Public Accountant who had been a member of the Board and whose firm did the accounting for the Foundation at one time, performed an accounting. In his testimony, he stated that from the end of 1996 through November 21, 1997 (when the monies were to be placed in the court registry), the Foundation overpaid their counsel in legal fees by $71,688.75. He noted that an annuity had been purchased to fund Berlier's salary for five years and that, in the absence of these expenditures, the Foundation would have been able to deposit the amount of $263,960.42 into the registry of the court on November 21, 1997. (Overpayment of fees, $71,688.75, plus annuity, $143,250.72, plus the actual deposited amount, $49,020.95, = $263,960.42.)
Ex-Board Member, David Wogan, testified that Berlier prepared the minutes for the meetings. He stated that both Chambers and Berlier attended the February of 1997 meeting in which counsel updated the members about the ongoing lawsuit and a possible federal lawsuit against respondents.
Al Demarest, a Board member and vicepresident of Chambers' printing business, testified that the Foundation's counsel told the Board in the February of 1997 meeting what had transpired in the court room when the agreement was reached. He testified that Chambers and Berlier attended all the Board meetings from February of 1997 through October of 1997. There were no meetings in March, June, July, November and December. However, in each meeting, the Foundation's counsel gave an updated legal report and Berlier supplied the financial report. In May of 1997, purchase of the annuity was recommended by the Board. Prior to this, no one had ever been given a long-term contract nor had the Foundation funded anyone's salary by purchasing an annuity. Berlier had received a one year contract at one time several years before these events.
According to Demarest, in September of 1997, the Board authorized payment of attorneys' fees based on three invoices in the total amount of $74,982.25. It also authorized Berlier to close Certificates of Deposit (CD) to fund the annuity, even though a penalty would be assessed. It did not authorize Berlier to close CDs to pay additional counsel's fees of $20,000 and $84,121.66 in October and November of 1997. Demarest noted that Berlier was the sole paid employee of the Foundation and that she was a non-voting member of the Board.
Demarest testified that the Board was not told that it had to turn over all assets by November 21, 1997 and was never given a copy of the order. However, he knew about it from conversations with Chambers. In addition, he said that he knew the Foundation had to use the $325,000 exclusively for the park under the agreement with respondents. Demarest stated that the Board also knew that the one-time annuity premium *367 would be paid from the reserve, but that the Foundation's attorneys had advised the Board that the expenditures were proper under the agreement.
Berlier and Chambers testified that neither knew of the terms of the agreement since it was never reduced to writing and neither was in the courtroom when it was read into the record. Further, they each asserted that the Foundation Board members were advised by counsel that the expenditures were in conformity with the agreement. Thus, they believed that the expenditures were proper. They each testified that the other attended the meetings.
Berlier stated that, although the minutes do not reflect it, the Board authorized her to cash CDs to pay for the legal fees (the $20,000 and $84,121.66) in September. The September minutes only show that the Board authorized the payment of $74,982.29 pursuant to bills submitted by counsel. She did not know why the authority to pay the other fees was not mentioned in any of the minutes, even though she recorded them. Berlier stated that she had to cash the CDs because the Foundation had no other money to pay the fees. Berlier stated that she was not aware that the Foundation overpaid counsel and did not believe it did. Berlier checked the bills and most of the time issued checks to the attorneys and that she usually rounded off the figure after counsel gave her an approximate amount owed. After the November 14, 1997 judgment, Berlier kept $900 in the account in order to pay casual workers employed for the Bingo games. She said that she had to add $100 of her own money after the November deposit because it was not enough. At the time of the contempt hearing, the account was down to $12.00 and checks still bounced after she added her own money to the account.
Berlier stated that she did not turn over the amount of $2,900 that remained in the Bingo account because $2,500 was controlled by the State of Louisiana and overseen by the Parish. She said that the State Police had informed her when she inquired that she had to keep that amount in the account. Otherwise, they would close the games. She inadvertently left $2,900 in the account, instead of $2,500.
Berlier noted that her job duties have increased due to the various litigation, even thought the Foundation's activities have decreased. She testified that the reason the Foundation purchased the annuity was to secure her position. She was becoming very unhappy because of all the legal problems. She testified that Chambers voted for the annuity contract.
Chambers testified that he had been President of the Foundation in 1996. In 1997, Fred Fassbender (Fassbender) was the vicepresident and he was in court representing the Foundation when the January 24, 1997 consent agreement was read into the record. The President at the time was Mike Nicole, who was not there. Chambers stated that he did not speak to Fassbender after the consent judgment and that the terms were not communicated to him. He stated that he only knew that the Foundation was supposed to spend money only on normal operations, "like the TRO." He claimed that he was not aware of the $325,000 reserve requirement in the agreement. However, he admitted that the Foundation's counsel advised the Board at each meeting as to what proper expenditures could be made and that he was at those meetings. Chambers asserted that he did not knowingly or willingly violate the trial court's order. He also testified that Berlier had never, to his knowledge, made unauthorized expenditures.
Chambers testified that Berlier had check signing authority. He was authorized on some accounts, but not the Bingo account. He said that Berlier provided the financial information to the Board for 1996 and 1997, but Chambers did not know how much money was in the account through 1997. He testified that the Executive Committee was authorized by the Board to approve all expenditures for legal fees. However, in January of 1996, the Board voted to hire present counsel with a retainer of $1,000 per month, not to exceed $12,000 in one year. He believed that the Board or the Executive Committee authorized Berlier to pay legal fees without a bill or before they accrued.
*368 Garrity, an attorney for the Foundation, testified that the January 24, 1997 agreement was never reduced to writing and that the first time he saw it after the hearing was in the transcript in conjunction with this rule for contempt. He stated that the agreement was read into the record from the respondents' attorney's notes and that the respondents' counsel was supposed to type it for distribution, but failed to do so. Garrity testified that he advised the Board as to whether the expenditures for the annuity and legal fees were proper. He believed that the expenditures did not violate the agreement. Garrity noted that the agreement was supposed to be a "stand still" agreement pending the trial set for February 27, 1997. However, the trial date was continued several times. In the meantime, other litigation ensued in Federal Court relative to the use of the Foundation's name and the Foundation's eviction from its offices. Garrity stated that this was because respondents had formed a clone organization to replace the Foundation and attempted to use the Foundation name. In addition, the respondents went to the legislature and successfully had a statute passed relative to the use of the name of a public entity without consent of the municipality. Garrity claimed that this was specifically aimed at the Foundation. He stated that all of these events contributed to the legal fees that the Foundation was forced to expend.
Garrity testified that the Foundation was also required to expend legal fees to prevent Berlier from leaving her position as Executive Director. He stated that it was forced into outbidding respondents because they had offered her two years of severance pay to resign. Garrity noted that Berlier had been employed since 1988 and was the only one who knew where all of the documents needed for the litigation could be found.
In her reasons for judgment, the trial judge declared that the testimony of Chambers and Berlier was not believable when they claimed that they were ignorant of the terms of the consent judgment because it had not been reduced to writing and because they were not in the courtroom when it was read into the record. She noted that when the consent judgment was read into the record, the Foundation's vice-president and member of the Executive Committee, Fassbender, acting as an officer, was present in court, imputing knowledge to the Foundation. In addition, another board member, Al Demarest, testified that he knew the terms of the consent judgment. She noted that Chambers was a member of the Executive Committee and Demarest was not. The trial judge believed that relators' attorney kept them advised, especially because of the attorney's fees charged in this matter. The trial judge found that Chambers and Berlier intentionally depleted the funds that were to be reserved for park expenditures. She noted that Berlier, with Chambers' authorization, redeemed the Foundation's certificate of deposit, at a loss, in order to access $84,121 and $20,000 to pay the Foundation's attorneys. She noted that the Foundation's minutes reflect that the purchase of the annuity was unanimously approved by the Foundation, even though doing so reduced the Foundation's funds below the specified amount of the consent judgment.

E. THE EXPENDITURES AND THE BINGO PROCEEDS
The first question is whether the expenditures by the Foundation from January 14, 1997 through November 21, 1997 were contemplated by the language of the consent judgment. The second question is whether Berlier was justified in not turning over $2,900 in Bingo proceeds under La.R.S. 33:4861.5. We conclude that some of the expenditures were not contemplated by the consent judgment and the statute did not bar Berlier from depositing the Bingo reserves into the registry of the court.
There was no persuasive evidence to contradict Rebow that the Foundation overpaid legal expenses. Further, the testimony by both Garrity and Berlier indicate the payments were made in a sloppy manner by Berlier, the Executive Director, who is responsible for paying the bills of the organization. The bills and payments should have been accounted for meticulously, particularly in light of the circumstances and despite knowing that the funds were limited and *369 were to be reserved. This conduct evidences a disregard by the Foundation, through Berlier, for its financial integrity, Thus, the overpayment of legal fees was not a normal operating expense and not for the benefit of the park.
In addition, we find that the purchase of the annuity by the Foundation was not a normal operating expense for the park. Furthermore, because the continued existence of the Foundation was in grave doubt at the time, the purchase of the annuity was in reckless disregard of the consent judgment. Thus, we find that neither expenditure was in compliance with the consent judgment.
La.R.S. 33:4861.1 et seq prohibits the disbursement of Bingo revenues, except for the purposes listed on the permit application. See: R.S. 33:4861.5. However, the order to deposit the funds in the court registry was not a disbursement outside of the boundary of the license. The trial court did not order the money to be spent, but simply removed from the bank account to the court registry. This order does not violate the law.

F. WILFUL VIOLATION

1. The Foundation
The Foundation was present in the courtroom when the agreement was confected and read into the record, through the presence of Fassbender, its vice-president. It is presumed to know its obligations under the consent judgment. Yet, the Foundation purchased the five-year annuity knowing that its existence was in jeopardy and it failed to use prudent accounting in payment of the legal fees, despite the limited funds available and the obligation to use them on the park, not for the benefit of the Foundation. Under these facts, we find that the trial judge was not "clearly wrong" in finding the Foundation in contempt of court.

2. Thomas Chambers and Carol Berlier
This finding applies to the Chambers and Berlier as well. Both attended the Board meetings and the testimony shows that counsel advised the Board of the consent judgment. They knew the funds were limited, but chose to spend the little money the Foundation had on expenditures that did not benefit the park, but only benefitted the Foundation. The parties cannot "hide behind" the attorneys. Before making the expenditures, they should have demanded a copy of the consent judgment. Chambers' testimony that he did not know about the agreement is not believable, as found by the trial judge, considering his position and history with the organization. Although Berlier claimed that she believed the expenditures were proper under the consent judgment as she understood it, the trial judge did not find her testimony credible either. In reviewing the evidence, we find no manifest error in this factual determination by the trial judge.
Accordingly, the judgment of the trial court is hereby affirmed. Costs of appeal are assessed against relators.
WRIT DENIED.
NOTES
[1] The Foundation also filed a petition for preliminary injunction to prevent another entity, The Friends of Lafreniere Park, Inc., from using the name "Friends of Lafreniere Park". In its petition, the Foundation made allegations of infringement of its trade name and unfair trade practices. The trial judge ruled in favor of The Friends of Lafreniere Park, Inc. That ruling was affirmed on appeal here. Lafreniere Park Foundation v. Friends of Lafreniere Park, Inc. 97-152 (La.App. 5th Cir. 7/29/97), 698 So.2d 449.
[2] Relators assert that the deposited amount was $49,020.95 and respondents assert that the amount was $48,840.95. In the transcript of this hearing, respondents agreed that the amount was $49,020.95.