788 So.2d 47 (2001)
Arne HOOK
v.
GEORGIA-GULF CORPORATION, Ed Schmitt, Tom Swanson and Jerry Satrum.
No. 99 CA 2791.
Court of Appeal of Louisiana, First Circuit.
January 12, 2001.
Writ Denied June 1, 2001.
*49 R. Bruce Macmurdo, Allen J. Myles, Baton Rouge, Counsel for Plaintiff/Appellee Arne Hook.
Murphy Foster, III, Leo Hamilton, Jerry L. Stovall, Jr., Baton Rouge, Counsel for Defendants/Appellants Georgia-Gulf Corporation, Ed Schmitt, Tom Swanson and Jerry Satrum.
Before: LeBLANC[1], KUHN, and MOORE,[2] JJ.
KUHN, Judge.
Defendant-appellant, Georgia Gulf Corporation (Georgia Gulf) terminated plaintiff-appellee, Arne Hook, from his position as manager of transportation and distribution for Georgia Gulfs Plaquemine, Louisiana plant. Hook was terminated three days after he angrily confronted Ed Schmitt, one of Georgia Gulfs vice-presidents who was the plant manager of the Plaquemine facility.[3] Shortly before he was terminated, Hook had been diagnosed with attention deficit hyperactivity disorder (ADHD) and was being treated with a prescription medication. He asserts the incident with Schmitt resulted because the medicine caused him to be irritable and unable to control his emotions. Hook asserts that although Georgia Gulf stated that the reason for his firing was his insubordinate conduct, he was terminated unlawfully because of a disability.
Hook filed suit seeking damages under the Louisiana Human Rights Act of 1988, La. R.S. 51:2231 et seq. (the LHRA or the Act).[4] The trial court ruled in Hook's favor ordering Georgia Gulf to pay him damages in the amount of $2,138,332.00. We reverse because we find the record fails to establish that Hook has a disability under the LHRA. And even if we were to find that he does have a disability, we conclude the LHRA does not protect the egregious/outrageous conduct which this case involves.

I. FACTUAL BACKGROUND
During 1971, Hook began working for Georgia Gulfs predecessor, Georgia Pacific Corporation (Georgia Pacific). During 1985, Georgia Gulf took over the operation of Georgia Pacific's chemical assets. From *50 that time, Hook worked in various positions for Georgia Gulf. He first held the position of purchasing agent, then purchasing manager, and then, ultimately, manager of transportation and distribution. He remained in that position until his termination in November of 1994.
From the late 1980's through some time in 1993, Hook reported directly to Schmitt. Schmitt is now the chief executive officer of Georgia Gulf but at that time was a manufacturing manager being trained for the positions of plant manager and vice-president of operations. Schmitt described his relationship with Hook over the years as confrontational. He explained that he and Hook disagreed about the operation of the Plaquemine facility and, as a result, their relationship deteriorated over the years. Despite the strained relationship, Hook received satisfactory ratings for his job performance.
Due to management reorganization in 1993, Hook and the transportation group that he managed began reporting directly to Thomas Swanson. Swanson was the vice-president of supply and corporate development and was based at Georgia Gulfs headquarters in Atlanta, Georgia.[5] Jerry Satrum, who was Georgia Gulf's chief executive officer at that time, effected the organizational change. Swanson was the person that Hook reported to on a daily basis. But since Hook worked at the Plaquemine plant and Schmitt was in charge of operating the Plaquemine facility, Hook also generally reported to Schmitt. As one of Georgia Gulf's six vice-presidents, Schmitt was considered to be above Hook in the chain of command.
Swanson testified that during the time that he supervised Hook, he personally had no problems with Hook although there were other employees that Hook managed that had complaints. He explained, however, that he did not trust Hook; he felt that Hook always had an "angle to what he was doing." Satrum testified that he was not pleased with Hook's "political maneuverings." Satrum opined that when Hook began reporting to Swanson, the relationship between Hook and Schmitt grew worse. Schmitt explained that when he and Hook disagreed, Hook attempted to go around him by getting approval from Swanson.
The incident at issue arose from such a situation. Schmitt explained that thousands of dollars had been spent on office equipment and renovations for Hook's transportation department but Hook continued to ask for additional improvements. Schmitt decided there were other departments that needed new equipment and physical improvements and that additional funds would not be spent on the transportation department until funds were allocated to these other departments. He informed Hook of his decision. But Hook later obtained authorization from Swanson for an $8,000.00 requisition for office equipment and partitions to be used in the transportation department. Swanson ultimately acknowledged that he had made a mistake by approving the requisition without first conferring with Schmitt since the matter involved the Plaquemine plant.
When Schmitt learned of the requisition, he cancelled it. On Tuesday, November 15, 1994, Pat Mack, the manager of the purchasing department informed Hook of the cancellation. Hook argued with Mack, who informed Hook that Schmitt had cancelled the requisition. Hook found Schmitt in the coffee room and asked to *51 speak with him in his office. Once they reached Schmitt's office, the men discussed the cancelled requisition. Schmitt explained to Hook that no additional funds would be spent on Hook's department until improvements had been made in other areas of the plant. Hook became very upset and launched into a loud tirade that lasted about five minutes. Schmitt stated that during this emotional outburst, Hook "dressed [him] down." Schmitt explained he was shocked by Hook's behavior because he was "carrying on" and talking very loudly. Although Schmitt testified he did not recall that Hook had cursed at him, Hook acknowledged that he called Schmitt a "f___ing hypocrite" and an "obstructionist tightwad." Hook contended this language was in response to Schmitt calling him a "f___ing primadonna." Schmitt maintained that he did not curse at Hook or yell at him.
Other Georgia Gulf employees overheard Hook's verbal attack on Schmitt. One of these employees, was Deanna McGee, Schmitt's secretary. She testified that she heard Hook yelling at Schmitt as she worked in her office, which was down the hall from Schmitt's office. McGee described Hook's yelling as continuous and stated she did not hear Schmitt say a word.
Schmitt explained that although he and Hook had argued about their differences of opinion in the past, this incident was different because of the manner in which Hook addressed him; he described it as a personal attack. Schmitt also stated that Hook insinuated he would circumvent Schmitt to have the requisition reinstated. According to Schmitt, when Hook finished the verbal attack, he said, "Now, I feel better" and walked out of the office. Hook also acknowledged that once he finished speaking, he calmed down and thanked Schmitt for hearing him out.
Later that day, Hook telephoned Swanson and related his version of the incident in an attempt to get the requisition back on track. Swanson testified that Hook was angry during this phone call and acknowledged that he had "lost it" and "kind of dressed [Schmitt] down." Later that afternoon, Schmitt also telephoned Swanson regarding the incident. Schmitt did not discuss the matter in detail at that time because he was scheduled to fly to Atlanta on Wednesday. While there, Schmitt met with Swanson, who testified that he did not fully understand the seriousness of the incident until this meeting took place. He and Schmitt discussed whether Hook should be terminated or whether his annual bonus should be withheld but no decision was made that day.
Schmitt and Swanson testified that when they met on Wednesday, they did not know that Hook had been diagnosed with ADHD. Swanson testified that when he spoke to Hook on Wednesday morning, Hook might have mentioned that he was suffering from insomnia and that he was taking some type of medication. But Swanson testified this did not make any impression on him at the time. He testified that there was no discussion about Hook being disabled or being on medicine during the Wednesday meeting with Schmitt.
As of that evening, Schmitt and Swanson decided to confer with James Worrell, Georgia Gulfs chief administrative officer in charge of the human resource department, and Joel Beerman, Georgia Gulfs vice-president of human relations and its chief counsel. On Thursday, these four met and decided that Hook would be terminated. According to them, there was no discussion about Hook taking medication or having ADHD or any other disability during this meeting.
*52 Once the decision was made, the group informed Satrum of their decision later that afternoon. He concurred with their decision and directed that they inform the other vice-presidents of the action they planned to take. On Friday morning, the other vice-presidents were advised that Hook would be terminated later that afternoon. Satrum also attended this meeting. During this meeting, Richard Marchese mentioned that Hook was being treated for depression and commented that perhaps Hook's behavior might be caused by his medication. Hook had informed him three months earlier that he was suffering from depression and was taking Prozac. Satrum testified that there was no discussion regarding Marchese's comment; all agreed that Hook's conduct was totally unacceptable and warranted termination. Later that day, Swanson telephoned Hook to advise that his employment had been terminated due to his insubordinate conduct. During this phone call, Hook advised Swanson that he was under a doctor's care for treatment of depression and that he was having trouble with his medication.

II. PROCEDURAL BACKGROUND
The trial court concluded that Hook established he was disabled under both state and federal guidelines, that he was qualified to perform the essential functions of his position, and that he was discharged because of his disability. The court awarded damages in the amount of $2,138,332.00.[6]
Georgia Gulf has appealed contending that Hook failed to prove he was terminated on the basis of a disability. Specifically, Georgia Gulf urges that: 1) Hook did not prove a covered disability; 2) Hook failed to prove that Georgia Gulfs supervisory personnel were aware of his disability or the resulting limitation when the decision to terminate him was made; and 3) Hook was terminated for a legitimate, nondiscriminatory reasonhis misconduct. Georgia Gulf also argues that Hook did not prove an unlawful failure to accommodate.
In response, Hook asserts that he is disabled as a result of his ADHD and that Georgia Gulf discharged him for conduct directly related to his disability. As a result, he contends he has established intentional discrimination based on his disability. He claims that Georgia Gulf officials were aware of his disability but failed to provide reasonable accommodations.

III. ANALYSIS
The LHRA prohibits discrimination against anyone because of race, creed, color, religion, sex, age, disability or national origin in connection with employment and in connection with public accommodations. La. R.S. 51:2231. Former La. R.S. 51:2242 provides that it is a discriminatory practice for an employer to discharge a person or otherwise discriminate against that person with respect to disability. Individuals claiming discrimination may bring an action in district court to enjoin further violations and to recover damages. La. R.S. 51:2264.
In analyzing an employment discrimination case based on a disability under the Act, the initial focus should not be on the intent of the defendant or the impact *53 of the alleged discrimination on the employee. Rather, the threshold issue is whether the plaintiff qualifies as disabled under the Act. See Talk v. Delta Airlines, Inc., 165 F.3d 1021, 1024 (5th Cir.1999). To establish a prima facie case under the LHRA, Hook must show: 1) he has a disability; 2) he is a qualified individual for the job in question; and 3) an adverse employment decision was made because of his disability. Id.
At trial, Hook presented evidence that he had been diagnosed with ADHD, a neurochemical disorder that affects the brain's functions, and a generalized anxiety disorder during May of 1994. His medical records demonstrated he had a history of being impulsive and having an explosive temper. During June of 1994, he was diagnosed with depression. He began taking Prozac but due to adverse side effects, he stopped taking it in July of 1994. During August of 1994, his doctor prescribed Ritalin. Hook experienced problems with insomnia and irritability. The medical testimony establishes that Hook's ADHD and the side effects of the Ritalin contributed to the behavior he exhibited when he confronted Schmitt.
A person is disabled under the LHRA if that individual suffers from "a physical or mental impairment that substantially limits one or more of the major life activities of the individual ...." La. R.S. 51:2232(11).[7] "Major life activities" is defined as including functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." La. R.S. 51:2232(11)(d).
The determination of whether an individual has a disability is an individualized inquiry. The determination is not necessarily based on the name or diagnosis of the impairment the person has, but rather on the effect of that impairment on the life of the individual. Sutton v. United Air Lines, Inc., 527 U.S. 471, 119 S.Ct. 2139, 2147, 144 L.Ed.2d 450 (1999) (addressing the Americans with Disabilities Act of 1990(ADA), 104 Stat. 328, 42 U.S.C. 12101 et seq.[8] In Sutton, petitioners had applied for employment as commercial airline pilots but were not allowed to complete the interview process because they did not meet the airline's minimum vision requirement for uncorrected visual acuity. Petitioners claimed they were disabled due to their myopic vision and filed a charge of disability discrimination under the ADA. The court rejected the petitioners' claim of disability, holding that the determination of whether an individual is disabled should be made with reference to measures that mitigate the individual's impairment. The Court recognized that the determination of whether an individual is substantially limited in a major life activity must take into account the effect of mitigating measures, such as taking medication or using assistive devices. "[T]he effect of those measures both positive and negativemust be taken into account when judging whether that person is `substantially limited' in a major life activity and thus `disabled'." Id. at 2146. Because each of the petitioners had vision that was 20/20 or better *54 with the use of corrective lenses, the Court found they were able to function identically to individuals without a similar impairment and were not disabled within the meaning of the ADA. Id. at 2147.
Initially, we find the evidence in this case fails to establish that Hook has a disability under the LHRA. We agree with Hook that his ADHD qualifies as an impairment and that in some instances this disorder may substantially limit an individual's major life activities. But in this case, the record does not specifically demonstrate that Hook was substantially limited in any of his major life activities. For the reasons that follow, we find the trial court erred in concluding that Hook established a disability.
We first address Hook's claim that he is substantially limited in his ability to learn. In order to determine whether a plaintiff is disabled, his abilities must be compared with most people or, in other words, to the average person in the general population. Gonzalez v. National Bd. of Medical Examiners, 60 F.Supp.2d 703, 708 (E.D.Mich.1999). Although both the psychologist and psychiatrist that treated Hook testified generally that the ADHD limited Hook's ability to learn, their testimony was very conclusory and did not specifically demonstrate that Hook was significantly restricted, as compared to an average person in the general population, as to the duration, manner and condition under which he can conduct the major life activity of learning. See Weber v. Strippit, Inc., 186 F.3d 907, 913 (8th Cir.1999), citing 29 C.F.R. § 1630.2(j)(1) and (2), cert. denied, 528 U.S. 1078, 120 S.Ct. 794, 145 L.Ed.2d 670 (2000); also see Sevigny v. Maine Education Assn.-National Education Assn., 1999 WL 1995208 (D.Me. 1999). No test results were introduced to substantiate the expert's conclusions in this regard. Dr. Henry Olivier, Hook's treating psychiatrist, administered the Timed Observation of Visual Attention test, an objective computer test used to diagnose ADHD. However, this test did not demonstrate or quantify how the ADHD affected Hook's intellectual functioning or his ability to learn.
While the experts testified that Hook's ADHD affected his ability to concentrate, this testimony only established that the ADHD has an effect on Hook's ability to learn, not that his ability to learn was substantially impaired. See DeMar v. Car-Freshner Corp., 49 F.Supp.2d 84, 91 (N.D.N.Y.1999). Impairments that merely affect major life activities must be distinguished from impairments that substantially limit major life activities. See Kohn v. AT & T Corp., 58 F.Supp.2d 393, 414 (D.N.J.1999). We conclude the former are not protected under the LHRA.
We also note that the experts who testified on Hook's behalf failed to address how the administration of the Ritalin affected Hook's ability to learn. The evidence does not clearly establish that Hook was substantially limited in his ability to learn despite his Ritalin treatment. The record establishes that Hook conducted his job activities in a satisfactory manner for over twenty-three years. There was no evidence that he was difficult to train or that he was had difficulties learning the skills needed to perform his job. Thus, from a legal standpoint, we find the evidence is insufficient to establish that Hook was substantially limited in his ability to learn. The trial court was manifestly erroneous in reaching that conclusion.
Hook also contends that he is substantially limited in his ability to concentrate and his ability to get along with others. In determining whether an activity, which is non-enumerated in La. R.S. 51:2232(11)(d,) is a major life activity, *55 courts should ask whether the activity is significant within the meaning of the LHRA rather than whether the activity is important to the particular plaintiff. Phillips v. Wal-Mart Stores, Inc., 78 F.Supp.2d 1274, 1281 (S.D.Ala.1999), affirmed, 220 F.3d 593 (11th Cir.2000). We decline to recognize the ability to concentrate and the ability to get along with others as major life activities. The inability to concentrate may be significant to a plaintiff in that it affects one or more of his major life activities, such as working, learning or speaking, but concentration is not an "activity" in and of itself and should not be recognized as a "major life activity" under the LDHA. See Pack v. Kmart, 166 F.3d 1300, 1305 (10th Cir.1999), cert. denied, 528 U.S. 811, 120 S.Ct. 45, 145 L.Ed.2d 40; Phillips v. Wal-Mart Stores, 78 F.Supp.2d at 1282.
Likewise, we conclude that the ability to get along with others is not a major life activity. This ability is too amorphous to be classified with the other abilities enumerated in the statute. And while such a skill is to be prized, we do not think the lack of such skill is the type of serious disability that our legislature intended to address when they enacted the LHRA. See Soileau v. Guilford of Maine, Inc., 105 F.3d 12, 15 (1st Cir.1997).[9]
Since Hook has failed to establish that one of his major life activities is substantially impaired, he has not set forth a prima facie case to recover damages under the LHRA. But more importantly, even if we were to conclude that Hook is disabled, we find the Act does not provide protection for Hook's egregious conduct. The uncontradicted testimony of Georgia Gulfs officials establishes that Hook was terminated because of his unacceptable conduct. Although Hook argues and the trial court found that the November 15th confrontation was caused by his ADHD, we find that, as a matter of law, the LHRA does not insulate an employee's emotional outbursts blamed on an impairment. See Hamilton v. Southwestern Bell Telephone Co., 136 F.3d 1047, 1052 (5th Cir.1998). We conclude that an employee who is fired because of outbursts at work (in this case, directed at a supervisor) has no legitimate claim under the LHRA. The cause of Hook's discharge was not discrimination based on ADHD but was rather his failure to recognize the acceptable limits of behavior in a workplace environment.
Georgia Gulf stated it fired Hook because of his insubordination. The trial court made a factual finding that Hook's conduct did not constitute insubordination. Although we disagree with the trial court that Hook's conduct was not insubordinate, we note that regardless of whether Hook's conduct constituted insubordination, his conduct was unacceptable and provided a legitimate, nondiscriminatory basis for his termination. The seriousness of Hook's misconduct warrants his termination.
The LHRA is an anti-discrimination statute designed to remove barriers which prevent qualified individuals with disabilities from enjoying the same employment opportunities that are available to persons without disabilities. See Burch v. Coca-Cola Co., 119 F.3d 305, 313 (5th Cir.1997), cert. denied, 522 U.S. 1084, 118 S.Ct. 871, 139 L.Ed.2d 768 (1998); Also see Taylor v. Principal Financial Group, Inc., 93 F.3d 155, 161 (5th Cir.), cert. denied, 519 U.S. 1029, 117 S.Ct. 586, 136 L.Ed.2d 515 (1996). The purpose of the statute is to allow disabled persons to compete in the *56 workplace and the job market based on the same performance standards and requirements expected of persons who are not disabled. See Paleologos v. Rehab Consultants, Inc., 990 F.Supp. 1460, 1464 (N.D.Ga.1998). It is not a job insurance policy but rather a legislative scheme for correcting illegitimate inequities faced by the disabled. See Hedberg v. Indiana Bell Telephone Co., Inc., 47 F.3d 928, 934 (7th Cir.1995). An employer subject to the LHRA must be permitted to terminate its employee on account of egregious misconduct, irrespective of whether the employee is disabled. See Little v. F.B.I., 1 F.3d 255, 259 (4th Cir.1993). We refuse to adopt an interpretation of the statute that would require an employer to accept egregious behavior by a disabled employee when that same behavior, exhibited by a non-disabled employee, would require termination. See Williams v. Widnall, 79 F.3d 1003, 1007 (10th Cir.1996). Thus, we reject Hook's argument, based on Teahan v. Metro-North Commuter Railroad, 951 F.2d 511 (2d Cir.1991), cert. denied, 506 U.S. 815, 113 S.Ct. 54, 121 L.Ed.2d 24 (1992), that firing an employee for conduct that is caused by his disability is the equivalent of firing the employee for the disability.
The role of the courts is not to judge whether an employer's personnel decisions are fair or good business decisions. The personnel decisions of a company may sometimes be harsh but unless they constitute a discriminatory practice under federal or state laws, courts must not interfere in these decisions. We find plaintiff has failed to establish that Georgia Gulf engaged in an unlawful discriminatory practice when Hook's employment was terminated.[10]

IV. CONCLUSION
We find the evidence in this case fails to establish that Hook has a disability under the LHRA. Hook did not prove he was substantially limited in any major life activities. Even if we were to conclude that Hook is disabled, we find the LHRA does not provide protection for Hook's egregious conduct. Hook's termination did not violate the provisions of the Act. Accordingly, we reverse the trial court's judgment awarding damages to Hook. Appeal costs are assessed against Hook.
REVERSED.
MOORE, J., concurs.
NOTES
[1] Judge Daniel W. LeBlanc, retired, is serving as judge ad hoc by special order of the Louisiana Supreme Court dated January 11, 2001.
[2] Judge D. Milton Moore of the 4th Judicial District Court is serving as judge pro tempore by special appointment of the Louisiana Supreme Court.
[3] During 1994, Georgia Gulf had five vice-presidents and a chief executive officer. Except for Ed Schmitt, these top executives were based in Atlanta, Georgia.
[4] La. R.S. 51:2242-2245, addressing discriminatory employment practices, was repealed in 1997 and replaced by La. R.S. 23:321, et seq. The parties agree that the former statutory provisions are applicable to this action, which was filed during 1995. We note, however, that the current statutory provisions are substantially similar to the relevant portions of the former statutory provisions.
[5] Swanson believed this change was due to his background in sales, marketing and purchasing and that it made good business sense for Hook's transportation/purchasing group to report to him.
[6] Ed Schmitt, Tom Swanson, and other Georgia Gulf employees were also individually named as defendants. Since the trial court's judgment did not address plaintiff's claims against these defendants and was not designated as a final judgment, this court issued a rule to show cause why this matter should not be dismissed as an appeal of a partial judgment pursuant to La. C.C.P. art. 1915(B), as amended by 1997 Acts, No. 483. In response, plaintiff submitted an order of the trial court designating the matter as a final judgment and specifying there is no just reason for delaying this appeal.
[7] Hook claims he was terminated as a result of conduct caused by an actual disability. He does not contend he was fired based on a record of disability or that he was regarded as disabled.
[8] Our analysis includes references to cases interpreting the ADA as well as the federal Rehabilitation Act of 1973, 29 U.S.C. 794. The parties likewise cite these cases as authority. Because the LHRA is similar in scope to these federal statutes and provides for the execution of the federal anti-discrimination policies, Louisiana courts appropriately consider interpretations of these federal statutes when interpreting our own state laws.
[9] The trial court relied on EEOC guidelines interpreting the ADA to support its determination that "concentration" and "interacting with others" are major life activities. We find the case authorities cited in our discussion on this issue are more compelling authorities.
[10] Due to our resolution of the issues regarding disability and misconduct, we pretermit a number of issues raised by the parties, including when Georgia Gulf acquired knowledge of Hook's ADHD condition and whether Georgia Gulf was required to reasonably accommodate his condition.