984 So.2d 61 (2008)
Devery PIERCE
v.
STATE of Louisiana, through the OFFICE OF the LEGISLATIVE AUDITOR and Dr. Daniel G. Kyle.
No. 2007 CA 0230.
Court of Appeal of Louisiana, First Circuit.
February 8, 2008.
Writ Denied April 25, 2008.
*63 John Dale Powers, Jeffrey J. Guidry, Steven H. Watterson, Baton Rouge, LA, for Plaintiff-Appellee, Devery Pierce.
Murphy J. Foster, III, Yvonne R. Olinde, Baton Rouge, LA, for Defendants-Appellants, State of Louisiana through the Office of the Legislative Auditor and Dr. Daniel G. Kyle.
Before CARTER, C.J., PETTIGREW, and WELCH, JJ.
PETTIGREW, J.
In the instant case, plaintiff filed a petition for damages against the defendants alleging that she was terminated from her employment as a result of disability discrimination. Following a bench trial, the trial court rendered judgment in favor of plaintiff in the amount of $50,000.00. For the reasons set forth more fully below, we reverse.

FACTS AND PROCEDURAL HISTORY
From June 1982 through her termination on November 15, 2002, plaintiff, Devery Pierce, was employed by the Office of the Legislative Auditor for the State of Louisiana ("OLA"). According to the record, Ms. Pierce originally started out as a Staff Auditor and worked her way up to Assistant Director of Audit in 1999, the position she held at the time of her termination. At all pertinent times hereto, Dr. Daniel G. Kyle was employed by the OLA as the Legislative Auditor.
In 1996, employees of the OLA were notified in an interoffice memorandum that Dr. Kyle was encouraging all staff members to "join the office's Toastmaster Program to enhance his or her professional development and growth." The memorandum also included the following directive:
As you know, Dr. Kyle has made the Toastmaster Program a formal portion of our office curriculum. The Training Catalog requires participation by all Staff Auditor Is and IIs. The office encourages participation by all staff. After deliberation, management decided to require participation in the Toastmaster Program by Senior Auditor Is instead of Staff Auditor Is and IIs. This means a Senior I must actively participate in our Toastmaster Program before being considered for a Senior Auditor II position. The Toastmaster Program is open to all staff. Speech topics should be on technical issues when the type of speech to be given is conducive to a technical topic.
In a subsequent memorandum dated July 26, 2002, Dr. Kyle notified employees of the OLA of a change in the policy concerning participation in the Toastmaster Program. The pertinent portions of this memorandum follow:
Since being appointed Legislative Auditor in 1989, I have encouraged each employee of this office to participate in the Toastmasters program to gain practical experience in communicating effectively. Many of you have done so and are to be commended for attaining the Competent Toast Master designation. Participation in Toastmasters is part of *64 the office training curriculum for Senior Auditor 1s.
. . . .
The ability to speak confidently and articulately before large or small groups is a critical requirement for staff in management positions. Therefore, I am requiring that, effective August 1, 2002, applicants for Senior Auditor 2 and higher level positions must have attained the Competent Toast Master designation in order to be eligible for promotion.
Employees currently in Senior Auditor 2 and higher level positions who are not Certified Toast Masters will have three years, until July 31, 2005, to attain this designation. Those who have not attained the Certified Toast Master designation by July 31, 2005 will be reclassified to the Senior Auditor 1 level.
On August 20, 2002, Ms. Pierce provided Dr. Kyle with a "Notice of Disability" stating that she suffered from a "medical condition" that made it "difficult, if not impossible" for her to participate in the Toastmaster Program. However, Ms. Pierce further stated, "In an effort to meet the new requirement, I have been and will continue to attend Toast Master meetings to achieve the Toast Master designation that you are now requiring of senior management."
Attached to Ms. Pierce's August 20, 2002 memorandum was a letter dated August 9, 2002, from her treating physician, Dr. Joseph A. Grizzaffi. According to Dr. Grizzaffi, Ms. Pierce had been under his care since April 1, 1989, and was currently being treated for Generalized Anxiety Disorder. Although Dr. Grizzaffi opined that Ms. Pierce's participation in the Toastmaster Program would be counter productive and actively detrimental to her emotional well-being and recommended that Ms. Pierce be excused from participating in the Toastmaster Program, he did acknowledge that Ms. Pierce is capable of speaking on issues "directly related to her work." Dr. Grizzaffi noted further, "As long as Mrs. Pierce is talking about something she knows very well and which is very factual such as things associated with her job as an auditor she can function reasonably well."
According to Ms. Pierce, she never refused to attend Toastmaster meetings. However, the record reflects she did not attend her first meeting until March 2002, and then only attended five additional meetings, all in 2002. Moreover, it was not until July 2002 that Ms. Pierce participated in the only speech evaluation she completed in connection with the Toastmaster Program. Ms. Pierce testified that she considered the Toastmaster Program to be an insignificant portion of her job and resented the fact that her supervisor, Robbie Robinson, dwelt on her failure to participate in the program as was required by Dr. Kyle.
In a September 20, 2002 evaluation, Ms. Pierce's supervisor identified, among other things, her failure to participate in the Toastmaster Program. Mr. Robinson indicated that he would continue to work with Ms. Pierce and encourage her participation in the Toastmaster Program, noting that "as a member of management her lack of participation has professionally impacted her relationship with [him] and upper management in this office." Mr. Robinson also addressed the fact that Ms. Pierce seemed to become too personally involved in the emotional affairs of her staff.
Following her September evaluation, Ms. Pierce began a written dialogue with Mr. Robinson and Dr. Kyle consisting of memoranda and emails, wherein she questioned Mr. Robinson's evaluation of her performance, requested specific examples and explanations from Mr. Robinson and *65 Dr. Kyle regarding their complaints about her actions as a supervisor, and even challenged Dr. Kyle's ability to evaluate her performance. Ultimately, Ms. Pierce met with Mr. Robinson and the OLA's Human Resource Director on November 15, 2002, wherein Mr. Robinson discussed what was expected of Ms. Pierce and the commitment that was required of her to avoid termination. Ms. Pierce was asked to agree to three items: (1) that she would not send anymore correspondence regarding her evaluation; (2) that she would actively participate in the Toastmaster Program beginning with the next meeting and would give three speeches and complete three roles within 90 days; and (3) that she would resume a professional attitude as an assistant director. When asked if she intended to comply, Ms. Pierce's response to all three items was "No I can not agree to do that." At that point, Mr. Robinson advised Ms. Pierce that her employment was being terminated.
Subsequently, on January 9, 2003, Ms. Pierce filed suit against the OLA and Dr. Kyle, personally, alleging that she was subjected to disability discrimination. The case proceeded to a six-day bench trial in September 2006, and the trial court took the matter under advisement. Thereafter, on December 18, 2006, the trial court rendered judgment in favor of Ms. Pierce and against the OLA and Dr. Kyle, awarding Ms. Pierce $50,000.00 in damages together with legal interest from the date of judicial demand until paid. On July 27, 2007, the trial court issued written reasons for judgment[1] as follows:
Having carefully considered the testimony, evidence, documents, and exhibits presented and introduced into evidence, along with the argument of counsel and all other relevant factors, the Court, being fully satisfied that plaintiff has established each essential [element] of her cause by at least a preponderance of the evidence, renders judgment in favor of Devery Pierce and against the defendants, the Office of the Legislative Auditor and Dr. Dan Kyle.
Specifically, the Court finds that petitioner Devery Pierce was a long-time employee of the Office of Legislative Auditor, having had a successful tenure spanning nearly twenty years. Nonetheless, in the weeks and months preceding her termination, Dr. Kyle instituted a policy whereby all of the auditors of the Office of Legislative Auditor would be required to participate in Toastmasters International, less and except several of the [plaintiffs] counterparts who were all middle-aged males. The Court also finds none were better educated nor more qualified than the plaintiff.
The Court also finds that the plaintiff had been diagnosed with and was being treated for social anxiety disorder and performance anxiety disorder, each of which are recognized mental disorders *66 which can impact and substantially affect and impair one's performance of major life activities.
The evidence further shows that the condition caused the petitioner to have a severe phobia of public speaking impromptu, extemporaneous, and even with prepared speeches with respect to personal matters. Part of the disorder was the expected evaluation or criticism which caused the petitioner a great deal of anxiety.
Although the petitioner's job required her to address legislative committees, she was well prepared to undertake that aspect of her job since it portended professional responsibility and discussions rather than personal considerations.
The petitioner attempted to speak to her superiors with regard to her condition on several occasions and asked that consideration be given as well as accommodation to allow her to work within her restriction. The evidence further suggests that the petitioner was very hesitant to have to make such disclosure for fear of retribution.
Nonetheless, she overcame that fear and discussed it with her superiors and even indicated that despite that condition she would do her dead-level best to try to overcome her condition.
Shortly after having made a request for accommodation regarding Toastmasters, the petitioner received her first poor performance review which caused her a great deal of depression, anxiety, and chagrin.
The evidence further shows that it was well known throughout the office that Toastmasters exemptions were given to other members of the staff who had no such medical restrictions. Thereafter, the policy became a rule by the Legislative Auditor despite it not having been published in the Louisiana Journal.
Petitioner consulted her physician and asked that he contact the employer on her behalf. The physician expressed his medical opinion stating that the petitioner's participation in Toastmasters International would be detrimental to her emotional well-being as well as counterproductive.
The evidence shows that Dr. Joseph [Grizzaffi] was an upstanding member of the medical community, the court accepted him as an expert, and there was no countervailing medical evidence, no request even for an independent medical examination.
The court finds that the disability suffered by the petitioner did not interfere with the appropriate performance of her job or responsibilities. The court also finds that Toastmasters International was not and could not be an essential function of her employment at the Office of the Legislative Auditor, and, indeed, was a private organization which she was required to support under fear of loss of her job.
The court also finds that the defendants knowingly and intentionally treated the petitioner in a disparate and discriminatory fashion and systematically violated her rights.
The court also finds that the petitioner was a disabled person within the meaning of the law but was otherwise qualified for the position that she held until her wrongful termination.
Therefore, the court finds in favor of the petitioner. Despite the long-suffering damage she sustained, the court is constrained and does honor the stipulation of the parties and therefore reduces the amount of the award to $50,000.00, which approximate the jurisdictional amount.
*67 The OLA and Dr. Kyle have appealed, assigning the following specifications of error:
1) The trial court erred by holding Dr. Kyle liable in his individual capacity.
2) The trial court erred by finding that [Ms. Pierce] was a disabled person under Louisiana law.
3) The trial court erred by finding that the [OLA and Dr. Kyle] discriminated against [Ms. Pierce].
4) The trial court erred by excluding from the trial proceedings Ms. Jennifer Schaye, the designated and authorized representative for the [OLA].

STANDARD OF REVIEW
The two-part test for the appellate review of a factual finding is: 1) whether there is a reasonable factual basis in the record for the finding of the trial court, and 2) whether the record further establishes that the finding is not manifestly erroneous. Mart v. Hill, 505 So.2d 1120, 1127 (La.1987). Thus, if there is no reasonable factual basis in the record for the trial court's finding, no additional inquiry is necessary. However, if a reasonable factual basis exists, an appellate court may set aside a trial court's factual finding only if, after reviewing the record in its entirety, it determines the trial court's finding was clearly wrong. See Stobart v. State, through Dept. of Transp. and Dev., 617 So.2d 880, 882 (La.1993). With regard to questions of law, the appellate review is simply a review of whether the trial court was legally correct or legally incorrect. On legal issues, the appellate court gives no special weight to the findings of the trial court, but exercises its constitutional duty to review questions of law and render judgment on the record. Succession of Bell, XXXX-XXXX, p. 5 (La.App. 1 Cir. 6/8/07), 964 So.2d 1067, 1071.

LIABILITY OF DR. KYLE IN HIS INDIVIDUAL CAPACITY
In her petition for damages, Ms. Pierce alleged that she was discriminated against by the OLA and Dr. Kyle, personally, based on her alleged disability and that she was improperly and arbitrarily terminated from her position with the OLA. On appeal, the OLA and Dr. Kyle argue that Ms. Pierce's claims are wholly and completely related to and arise out of her employment relationship with the OLA. As such, the OLA and Dr. Kyle submit Ms. Pierce has failed to prove that Dr. Kyle was her "employer" for purposes of a claim of employment discrimination. We agree.
Ms. Pierce filed suit for employment discrimination against the OLA and Dr. Kyle pursuant to the Louisiana Employment Discrimination Law ("LEDL"), La. R.S. 23:301, et seq. As set forth in La. R.S. 23:323, no "employer" shall subject an employee to discrimination on the basis of a disability. "Employer" is defined, in pertinent part, in La. R.S. 23:302(2) as follows:
"Employer" means a person, association, legal or commercial entity, the state, or any state agency, board, commission, or political subdivision of the state receiving services from an employee and, in return, giving compensation of any kind to an employee. The provisions of this Chapter shall apply only to an employer who employs twenty or more employees within this state for each working day in each of twenty or more calendar weeks in the current or preceding calendar year. "Employer" shall also include an insurer, as defined in R.S. 22:5, with respect to appointment of agents, regardless of the character of the agent's employment.
Ms. Pierce's claim for disability discrimination against Dr. Kyle personally is without *68 merit since she does not allege nor did she introduce any evidence to suggest that Dr. Kyle personally employs twenty, fifteen, or even one employee. At all times relevant to Ms. Pierce's claims, Dr. Kyle was the Legislative Auditor employed by the State of Louisiana. Ms. Pierce even acknowledged this fact in her petition, stating "[a]t all times material hereto, Dr. Daniel G. Kyle was employed as Legislative Auditor for the State of Louisiana, and was acting in that capacity in committing the acts complained of herein." Moreover, Dr. Kyle testified that he never personally employed Ms. Pierce, nor did he ever personally contract with Ms. Pierce to do any work for him. Thus, a plain reading of the LEDL reveals that Dr. Kyle cannot be held liable individually for the acts of disability discrimination alleged by Ms. Pierce because Dr. Kyle simply is not an employer as defined under that statute. Accordingly, based on the facts and circumstances as presented herein, there can be no judgment against Dr. Kyle personally.

MS. PIERCE'S ALLEGED DISABILITY
On appeal, the OLA and Dr. Kyle argue that the trial court erred in holding that Ms. Pierce was a disabled person under Louisiana law. Citing La. R.S. 23:322(3), the OLA and Dr. Kyle submit that in order to state a claim as a disabled person, Ms. Pierce was required to prove by a preponderance of the evidence that she suffered from an impairment that substantially limited a major life activity. Having thoroughly reviewed the record before us, we agree with the OLA and Dr. Kyle that Ms. Pierce fell "woefully short of fulfilling this burden."
The LEDL prohibits discrimination in the workplace on the basis of a disability. La. R.S. 23:323. As set forth in La. R.S. 23:322(3), a disabled person is "any person who has a physical or mental impairment which substantially limits one or more of the major fife activities, or has a record of such an impairment, or is regarded as having such an impairment."
At trial, Ms. Pierce presented uncontradicted evidence that she had been diagnosed with Generalized Anxiety Disorder and that she had been under a doctor's care and taking medication for depression and anxiety for approximately ten years. Her treating physician, Dr. Grizzaffi, testified that Ms. Pierce suffered from difficulties with sleep, feelings of fatigue and agitation, loss of appetite, and physical symptoms of nausea and diarrhea. When asked how Ms. Pierce's condition would affect her ability to cope in a social setting, Dr. Grizzaffi noted, "with individuals that she doesn't know very well, with strangers, in any situation where she might have a conflict or some kind of . . . confrontation, she would be very uncomfortable or she would avoid that type of situation altogether." Dr. Grizzaffi indicated that Ms. Pierce's work situation was stressful for her in the amount of work she was responsible for and in having to deal socially with other people in the office. However, Dr. Grizzaffi acknowledged that over time, Ms. Pierce became more comfortable with her work situation and actually joined an employees' social club comprised of her coworkers.
With regard to Ms. Pierce's participation in the Toastmaster Program, Dr. Grizzaffi indicated it was his understanding from what Ms. Pierce had told him that she would have to give spontaneous speeches on various topics that would be assigned to her. Dr. Grizzaffi testified that part of Ms. Pierce's overall anxiety problem was performance anxiety and that she was fearful of being judged and critiqued by her coworkers. Dr. Grizzaffi *69 believed that any participation by Ms. Pierce in the Toastmaster Program would be counterproductive and detrimental to her emotional well being. According to Dr. Grizzaffi, he was concerned that Ms. Pierce's participation in the program could potentially affect her actual functioning in her job setting, in addition to affecting all other areas of her life. Dr. Grizzaffi noted, however, that Ms. Pierce is reasonably comfortable in her job setting talking to anyone about things that involve her work.
Although it is clear from the record that Ms. Pierce suffered from a mental impairment, our inquiry into her alleged disability does not end here. Pursuant to the LEDL, Ms. Pierce was required to prove that her mental impairment substantially limited a major life activity. A thorough review of the record before us does not specifically demonstrate that Ms. Pierce was substantially limited in any of her major life activities. Accordingly, for the reasons that follow, we find the trial court erred in concluding that Ms. Pierce established she was disabled.
A "major life activity" is defined as "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." La. R.S. 23:322(7). Major life activities are the basic tasks of central importance to most people's daily lives that average persons can perform with little or no difficulty. Burns v. Air Liquide America, L.P., 515 F.Supp.2d 748, 756 n. 6 (S.D.Tex.2007). The United State Supreme Court has defined the term "substantially limits" as "[u]nable to perform a major life activity that the average person in the general population can perform;" or "[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." Sutton v. United Air Lines, Inc., 527 U.S. 471, 480, 119 S.Ct. 2139, 2145, 144 L.Ed.2d 450 (1999) (addressing the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101, et seq.).[2] Impairments that merely affect major life activities must be distinguished from impairments that substantially limit major life activities. Hook v. Georgia-Gulf Corp., 99-2791, p. 11 (La.App. 1 Cir. 1/12/01), 788 So.2d 47, 54, writ denied, XXXX-XXXX (La.6/1/01), 793 So.2d 200.
The determination of whether an individual has a disability is an individualized inquiry. The determination is not necessarily based on the name or diagnosis of the impairment the person has, but rather on the effect of that impairment on the life of the individual. Sutton, 527 U.S. at 483, 119 S.Ct. at 2147. In Sutton, petitioners had applied for employment as commercial airline pilots but were not allowed to complete the interview process because they did not meet the airline's minimum vision requirement for uncorrected visual acuity. Petitioners claimed they were disabled due to their myopic vision and filed a charge of disability discrimination under the ADA. The court rejected the petitioners' claim of disability, holding that the determination of whether *70 an individual is disabled should be made with reference to measures that mitigate the individual's impairment. The Court recognized that the determination of whether an individual is substantially limited in a major life activity must take into account the effect of mitigating measures, such as taking medication or using assistive devices. "[T]he effects of those measuresboth positive and negativemust be taken into account when judging whether that person is `substantially limited' in a major life activity and thus `disabled.'" Sutton, 527 U.S. at 482, 119 S.Ct. at 2146. Because each of the petitioners had vision that was 20/20 or better with the use of corrective lenses, the Court found they were able to function identically to individuals without a similar impairment and were not disabled within the meaning of the ADA. Sutton, 527 U.S. at 488-489, 119 S.Ct. at 2149.
In Hook, 99-2791 at p. 11, 788 So.2d at 54-55, this court set forth guidelines for determining what activities qualify as a major life activity, stating: "In determining whether an activity, which is non-enumerated in La. R.S. 51:2232(11)(d), is a major life activity, courts should ask whether the activity is significant within the meaning of the LHRA [Louisiana Human Rights Act] rather than whether the activity is important to the particular plaintiff."[3] The Hook court declined to recognize the ability to get along with others as a major life activity, noting that the "ability is too amorphous to be classified with the other abilities enumerated in the statute." Hook, 99-2791 at p. 12, 788 So.2d at 55. The court added "while such a skill is to be prized, we do not think the lack of such skill is the type of serious disability that our legislature intended to address when they enacted the LHRA." Id.
In Toyota Motor Mfg., Kentucky, Inc. v. Williams, 534 U.S. 184, 197-198, 122 S.Ct. 681, 691-692, 151 L.Ed.2d 615 (2002), the Court addressed the issue of what constitutes a major life activity:
"Major" in the phrase "major life activities" means important. "Major life activities" thus refers to those activities that are of central importance to daily life. In order for performing manual tasks to fit into this categorya category that includes such basic abilities as walking, seeing, and hearingthe manual tasks in question must be central to daily life. If each of the tasks included in the major life activity of performing manual tasks does not independently qualify as a major life activity, then together they must do so.
That these terms need to be interpreted strictly to create a demanding standard for qualifying as disabled is confirmed by the first section of the ADA, which lays out the legislative findings and purposes that motivate the Act. See 42 U.S.C. § 12101. When it enacted the ADA in 1990, Congress found that "some 43,000,000 Americans have one or more physical or mental disabilities." If Congress intended everyone with a physical impairment that precluded the performance of some isolated, unimportant, or particularly difficult manual task to qualify as disabled, the number of disabled Americans would surely have been much higher.
We therefore hold that to be substantially limited in performing manual tasks, an individual must have an impairment *71 that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives. The impairment's impact must also be permanent or long term.
It is insufficient for individuals attempting to prove disability status under this test to merely submit evidence of a medical diagnosis of an impairment. Instead, the ADA requires those "claiming the Act's protection . . . to prove a disability by offering evidence that the extent of the limitation [caused by their impairment] in terms of their own experience . . . is substantial." That the Act defines "disability" "with respect to an individual," 42 U.S.C. § 12102(2), makes clear that Congress intended the existence of a disability to be determined in such a case-by-case manner. [Citations omitted.]
In the instant case, the trial court apparently considered impromptu, extemporaneous public speaking and prepared speeches with respect to personal matters to be a major life activity. Considering the applicable statutes and jurisprudence interpreting same as set forth above, we conclude the trial court erred in this finding.
At the outset, we note, as did the OLA and Dr. Kyle on appeal, that the evidence does not support a finding that Ms. Pierce was required to engage in impromptu speaking or was in any way required to speak on personal matters while participating in the Toastmaster Program. Ms. Pierce testified that she was given as much time as she needed to prepare for her Toastmaster speeches and that the speeches generally averaged between two and three minutes each. Moreover, Ms. Pierce acknowledged that she was never told by anyone at the OLA that her speeches had to be on personal, as opposed to technical, issues. In fact, Ms. Pierce testified that one of the presentations that she received credit for in the Toastmaster Program was a work-related meeting that she was asked to attend. When she arrived at the meeting, no one seemed to be in charge, so she took charge and conducted the meeting. She was evaluated on a Toastmaster form and received high marks for her performance.
Nonetheless, even if Ms. Pierce had proven that she was required to engage in impromptu speaking or speak on personal matters in the Toastmaster Program, our ultimate conclusion on this issue would remain unchanged. Being able to participate in the Toastmaster Program is not the type of activity that is of central importance to most people's daily lives. It is not a task that the average person can perform with little or no difficulty. See Burns, 515 F.Supp.2d at 756 n. 6. Public speaking is not for everyone. We do not believe the lack of such a skill is the type of serious disability that our legislature intended to address when they enacted the LEDL. See Hook, 99-2791 at p. 12, 788 So.2d at 55. Thus, Ms. Pierce has failed to prove that her mental impairment substantially limited a major life activity. Accordingly, she is not disabled under the LEDL and cannot recover damages as a result of her termination.[4]

CONCLUSION
We find the evidence in this case fails to establish that Ms. Pierce has a disability under the LEDL. Ms. Pierce did not prove that she was substantially limited in any major life activities. Accordingly, we reverse *72 the trial court's judgment awarding damages to Ms. Pierce. All costs associated with this appeal are assessed against Ms. Pierce.
REVERSED; RULE TO SHOW CAUSE VACATED.
NOTES
[1] According to the record, once this appeal was lodged, the OLA and Dr. Kyle filed a motion to remand the case to the trial court for entry of written reasons for judgment. Another panel of this court granted the motion and ordered the trial court to issue findings of fact and written reasons for judgment, which the trial court complied with on July 27, 2007. In a separate action, this court, ex proprio motu, issued a rule to show cause why the appeal should not be dismissed based on lack of specificity in the December 18, 2006 judgment of the trial court as required by La.Code Civ. P. arts. 1917(B) and 1812(C). The rule was referred to the merits for consideration by this panel. Based on our review of the record as it now stands and considering the fact that the trial court has complied with this court's previous order to issue findings of fact and written reasons for judgment, we find the lack of specificity in the December 18, 2006 judgment has been sufficiently addressed and therefore vacate the previously issued rule to show cause.
[2] Our analysis includes references to cases interpreting the ADA. The parties likewise cite these cases as authority. Because the LEDL is similar in scope to this federal statute, Louisiana courts appropriately consider interpretations of this federal statute when interpreting our own state laws. See Smith v. Thurman Oils, Inc., XXXX-XXXX, p. 4 (La.App. 1 Cir. 12/28/06), 951 So.2d 359, 361, writ denied, XXXX-XXXX (La.3/23/07), 951 So.2d 1106.
[3] The Hook court considered a claim filed under the LHRA of 1988, La. R.S. 51:2231, et seq., which made unlawful discriminatory practices in employment. Sections 51:2242 through 2245 of the LHRA were repealed by Acts 1997 No. 1409, § 4, effective August 1, 1997, and were replaced by Sections 23:301, et seq. of the LEDL.
[4] Having reached this conclusion, the remaining assignments of error are moot, and we pretermit consideration of same.