964 So.2d 1067 (2007)
SUCCESSION OF Geraldine Jones BELL.
No. 2006 CA 1710.
Court of Appeal of Louisiana, First Circuit.
June 8, 2007.
*1068 Kristina Webb Shapiro, Shapiro & Shapiro, L.L.C., Baton Rouge, for Appellee Jackie Netter.
Dele A. Adebamiji, Felicia E. Adebamiji, Baton Rouge, for Appellant Rhonda McNeely Joseph.
Before: PARRO, GUIDRY, and McCLENDON, JJ.
PARRO, J.
Rhonda McNeely Joseph appeals a judgment of homologation of the tableau of distribution in Geraldine Jones Bell's succession, claiming the court did not properly credit her for amounts she spent for the benefit of the estate. She also appeals an earlier judgment finding her in contempt of court.

FACTUAL AND PROCEDURAL BACKGROUND
Rhonda McNeely Joseph is one of Geraldine Bell's five childrenthe others are *1069 Jackie Netter, Gwendolyn Smith, Sharon Thompson, and Shelia Thompson. Shelia predeceased her mother, leaving two major children, Quantel and Latoya Thompson. Ms. Bell died intestate on November 29, 2003. On March 5, 2004, Netter petitioned to be appointed administratrix of her mother's succession; the court granted her request on March 8, 2004. The detailed descriptive list filed by Netter showed the decedent's known assets consisted of a house, home furnishings, personal items, and a car.
On May 11, 2004, Netter filed a motion requesting Joseph to turn over the decedent's property and all records pertaining to it, alleging that Joseph and her daughter had moved into the decedent's house and were refusing to grant Netter access to it or information concerning other property of the estate. She also alleged that her mother's car had been wrecked and impounded while in Joseph's possession. A hearing was held July 26, 2004, at which time Joseph indicated that she had moved into the house and had put some household furnishings in storage to prevent vandalism, and that she was interested in remaining in the house and eventually purchasing it. A judgment was rendered that day, ordering Joseph to turn over all property of the decedent to Netter, but allowing her to continue to live in her mother's house pending closing of the succession. The judgment also ordered Joseph to continue to pay the mortgage on her mother's house and the storage fees for the movables she had put in storage. She was also ordered to pay for retrieving the damaged vehicle from impound storage, to turn over all records and information concerning the assets of the succession, and to provide the residence key and storage unit key to Netter. The judgment was signed September 1, 2004.
In November 2004, Netter moved for authority to list the house for sale for $79,500, averring that despite the September 1 court order, Joseph had refused to provide her with a key or to cooperate in either purchasing the house or in allowing Netter to market it. The motion was granted in an order signed November 18, 2004, in which the court again ordered Joseph to provide keys, authorized Netter to change the locks if the keys were not provided, authorized a realtor's lockbox to be placed on the home, and ordered Joseph to cooperate in showing the house. Joseph then moved to amend the order to fix the value of the property at $60,000, attaching an appraisal for that amount and stating the appraisal done for Netter was "extremely overpriced." She also contended Netter should not have unfettered entry into the home, complaining that as a result of the November 18 order, which was rendered without a hearing, Netter had changed the lock on the house and locked Joseph out. She asked the court to order that she be given notice twenty-four hours before any showings of the house and to allow only the realtor, and not Netter, to have access to the house. Joseph's requests regarding access to the house were granted in an order signed December 29, 2004,[1] and an evidentiary hearing on the value of the house was set.
Before that hearing, Netter moved to amend the detailed descriptive list, to be reimbursed for some expenses, and to be provided with an inventory and accounting from Joseph for some of her mother's movable property that appeared to be missing. Netter also averred that Joseph had removed the realtor's lockbox, changed the locks again, removed the "For *1070 Sale" sign, and refused to allow showings of the house; she asked the court to order Joseph to vacate the property so it could be marketed. After a hearing on April 25, 2005, the court approved Netter's amended detailed descriptive list and dismissed Joseph's motion to value the house at $60,000. The court found Joseph in contempt of court for failing to pay the costs of retrieving the vehicle from impound and ordered her to reimburse Netter for those expenses within 15 days. The court also found her in contempt of court for failing to turn over all furniture and personal effects and gave her fifteen days to cure this contempt. She was also found in contempt for failing to provide Netter with a key, was ordered to reimburse within 15 days the cost Netter had incurred to change the lock, and was ordered to provide Netter with a copy of all keys, to allow a lockbox to be placed on the house, and to cooperate with Netter and the realtor in showing the house. The court also ordered Joseph to move out of the house by June 1, 2005, and to maintain the mortgage payments until she vacated the property.[2] She was also ordered to pay attorneys fees in the amount of $1000 for contempt of court, and all costs of the proceedings. The judgment was signed May 11, 2005. In June 2005, in response to a motion filed by Netter, the court ordered that the property be listed for $75,000, and in September 2005, a sale of the house for that amount was approved by the court.
A tableau of distribution was filed by Netter on December 13, 2005, and was opposed by Joseph, who submitted additional mortgage and storage payments for reimbursement. Joseph contended that she owned another house and had moved into her mother's home only to thwart vandalism and preserve its value. Therefore, she claimed reimbursement for all mortgage payments and storage bills paid by her, including those paid after the court order of July 2004. After a hearing on February 13, 2006, Joseph's opposition claims were denied, and the tableau of distribution filed by Netter was approved and homologated in a judgment signed March 6, 2006.[3]
Joseph appeals the March 6, 2006 judgment and the May 11, 2005 contempt judgment. She claims the court erred in not reimbursing her for $5,398.12 in mortgage payments and $1,573.00 in storage fees that she paid after her mother's death;[4] she also contends the contempt judgment was unjustified and excessive. Netter argues that an appeal of the contempt judgment is untimely. She also contends Joseph was reimbursed for all the payments she made before the July 26, 2004 judgment ordering her to pay the mortgage, and that no additional reimbursement for later payments is due, because those payments were pursuant to court order and in recognition of the fact that Joseph was living in the house. Netter also argues that since Joseph was living in the house, there was no need to "protect" the movable property from vandalism by putting it *1071 in storage, so the storage fees were not a necessary expense of the succession. Netter further states that while the succession remained open, she, as administratrix of the succession, was the only person with any right to manage the property, pursuant to court order. Therefore, the extraneous expenses that Joseph may have incurred were unauthorized and not due to be reimbursed from the succession.

STANDARD OF REVIEW
The appellate court's review of factual findings is governed by the manifest error-clearly wrong standard. The two-part test for the appellate review of a factual finding is: 1) whether there is a reasonable factual basis in the record for the finding of the trial court; and 2) whether the record further establishes that the finding is not manifestly erroneous. Mart v. Hill, 505 So.2d 1120, 1127 (La.1987). Thus, if there is no reasonable factual basis in the record for the trial court's finding, no additional inquiry is necessary to conclude there was manifest error. However, if a reasonable factual basis exists, an appellate court may set aside a trial court's factual finding only if, after reviewing the record in its entirety, it determines the trial court's finding was clearly wrong. See Stobart v. State, through Dep't of Transp. and Dev., 617 So.2d 880, 882 (La.1993).
With regard to questions of law, the appellate review is simply a review of whether the trial court was legally correct or legally incorrect. Hidalgo v. Wilson Certified Exp., Inc., 94-1322 (La.App. 1st Cir.5/14/96), 676 So.2d 114, 116. On legal issues, the appellate court gives no special weight to the findings of the trial court, but exercises its constitutional duty to review questions of law and render judgment on the record. In re Mashburn Marital Trust, 04-1678 (La.App. 1st Cir.12/29/05), 924 So.2d 242, 246, writ denied, 06-1034 (La.9/22/06), 937 So.2d 384.

CONTEMPT OF COURT
We address first the issue of whether the trial court abused its discretion in holding Joseph in contempt of court and imposing a fine on her. In this case, the court held Joseph in contempt for violating the previous orders of the court to pay the costs of retrieving the damaged car from impound storage, to provide Netter with a key and allow her access to the house, and to cooperate with her attempts to market the house. Netter argues that this assignment of error is without merit, because the judgment finding Joseph in contempt of court was an appealable judgment, which became final when it was not timely appealed.
A direct contempt of court is defined in LSA-C.C.P. art. 222 as "one committed in the immediate view and presence of the court and of which it has personal knowledge, or a contumacious failure to comply with a subpoena or summons, proof of service of which appears of record." Constructive contempt of court is defined in LSA-C.C.P. art. 224 as "any contempt other than a direct one," including willful disobedience of any lawful judgment, order, mandate, writ, or process of the court. LSA-C.C.P. art. 224(2). The procedures to be followed in charging and adjudicating a charge of constructive contempt are described in LSA-C.C.P. art. 225, and include a rule to show cause describing the facts alleged to constitute the contempt, notice to the person charged at least 48 hours before the hearing, and a trial of the rule.
A judgment that does not determine the merits, but only preliminary matters in the course of the action, is an interlocutory judgment. A judgment that determines the merits in whole or in part *1072 is a final judgment. LSA-C.C.P. art. 1841. An interlocutory judgment is appealable only when expressly provided by law. LSA-C.C.P. art. 2083(C). Even though an interlocutory judgment is not immediately appealable, it can still be reviewed when an unrestricted appeal is taken from a final judgment; in such an appeal, the appellant is entitled to seek review of all adverse interlocutory judgments prejudicial to him, in addition to the review of the final judgment. Wooley v. Amcare Health Plans of Louisiana, Inc., 05-2025 (La.App. 1st Cir.10/25/06), 944 So.2d 668, 674.[5] A trial court is vested with great discretion in determining whether a party should be held in contempt, and its decision will only be reversed when the appellate court discerns an abuse of that discretion. de Nunez v. Bartels, 97-1384 (La.App. 1st Cir.9/9/98), 727 So.2d 463, 469-70.
A judgment of contempt of court is an interlocutory judgment, since it does not determine the substantive merits of the case. There is no statute allowing an immediate appeal of a judgment of contempt. Therefore, even if it may have been an appealable judgment when rendered, we must apply the amended provisions of Article 2083 retroactively. Because the contempt issue was raised in connection with the appeal of the final judgment of homologation in the succession, we are required to consider that issue as part of this appeal.
The contempt judgment rendered in this case was for constructive contempt of court, in that Joseph had refused to obey lawful orders of the court. On September 4, 2004, the court ordered Joseph to provide the administratrix with a key to the residence and to pay the impound fees for the car. On November 18, 2004, the court again ordered Joseph to provide the key and authorized Netter to change the locks if Joseph failed to give her the key to the house. By the time of the next hearing in April 2005, Joseph had still not obeyed any of the court's orders. The court found Joseph in contempt for failing to obey the court's orders to pay the impound fees, to turn over all furniture and personal effects, and to provide Netter with a key to the house. The court also ordered Joseph to reimburse the estate for amounts Netter had expended in redeeming the damaged vehicle and changing the locks. These amounts had still not been paid at the time the tableau of distribution was homologated. We find no error or abuse of discretion in these assessments, since they were simply reimbursements of amounts that Joseph's actions had cost the estate.
However, the record fails to show that the procedures outlined in LSA-C.C.P. art. 225 were followed in this case. The motion filed by Netter did not specifically request a finding of contempt of court for Joseph's refusal to obey the orders of the court. Therefore, although the court was within its authority to require the reimbursement of expenses incurred by the administratrix due to Joseph's actions, it could not find her in contempt of court and impose penalties without following the mandatory requirement that the facts constituting *1073 the alleged contempt be set forth in a rule to show cause. See Lang v. Asten, Inc., 05-1119 (La.1/13/06), 918 So.2d 453, 454-55. Accordingly, the court's finding of contempt and imposition of $1000 in attorney fees must be reversed.

PAYMENT OF EXPENSES
Succession occurs at the death of a person. LSA-C.C. art. 934. Immediately at the death of the decedent, universal successors acquire ownership of the estate. LSA-C.C. art. 935. Ownership of the same thing by two or more persons is ownership in indivision, or co-ownership. See LSA-C.C. art. 797. Prior to the qualification of a succession representative, a successor may exercise rights of ownership with respect to his interests in a thing of the estate, as well as his interest in the estate as a whole. LSA-C.C. art. 938(A). A co-owner may, without the concurrence of any other co-owner, take necessary steps for the preservation of the thing that is held in indivision. LSA-C.C. art. 800. A co-owner who, on account of the thing held in indivision, has incurred necessary expenses, expenses for ordinary maintenance and repairs, or necessary management expenses paid to a third person, is entitled to reimbursement from the other co-owners in proportion to their shares. If the co-owner who incurred such expenses had the enjoyment of the thing held in indivision, his reimbursement shall be reduced in proportion to the value of the enjoyment. LSA-C.C. art. 806. If a successor exercises his rights of ownership after the qualification of a succession representative, the effect of that exercise is subordinate to the administration of the estate. LSA-C.C. art. 938(B). The succession representative is a fiduciary with respect to the succession, and has the duty of collecting, preserving, and managing the property of the succession in accordance with law. See LSA-C.C.P. arts. 3191 and 3221. The succession representative may sell estate property and pay estate debts, but only with the authorization of the court. See LSA-C.C.P. arts. 3261 and 3301.
Reviewing the facts of this case in the light of the applicable law, it is clear that Joseph and her siblings became owners in indivision of their mother's estate at the moment of her death in November 2003. At that point, as a co-owner of her mother's property, Joseph had the right to exercise all rights of ownership of that property, including moving into her mother's house. However, once Netter was appointed as the administratrix of the succession on March 8, 2004, those ownership rights became subordinate to Netter's rights to administer the property. And Netter's rights to administer the property were subject to court approval. Therefore, once the administratrix was appointed by the court, Joseph could no longer make unilateral decisions about estate property; her decisions were subject to Netter's authority and ultimately, to the authority of the court.
It is apparent from the record that Joseph never accepted the authority of either the administratrix or the court. She may have believed she was doing the right thing, and perhaps before the administratrix was appointed, Joseph's actions inured to the benefit of all the co-owners. However, Joseph's later actions, including her refusal to provide Netter with a key to the house and her attempts to thwart the sale of the house by removing the "For Sale" sign, were detrimental to the interest of the co-owners, because Netter had to return to court numerous times in order to accomplish the duties with which she was charged. Joseph's unwillingness to accede to the authority of the administratrix and the court required the expenditure *1074 of estate funds on attorney fees and court costs.
Despite Joseph's refusal to cooperate with Netter, Joseph was reimbursed for all the initial mortgage payments that she made before Netter's appointment, plus additional payments prior to the court's order in July 2004. She was also reimbursed for insurance and escrow payments made in September 2004. After July 26, 2004, the mortgage payments Joseph made were in fulfillment of the court's order and recognized that she had complete enjoyment of the house and its contents. Although she testified at the final account hearing that she had never really moved into the house and had completely moved out by January 2005, the court emphatically rejected that contention, stating, "[Y]ou were ordered out of the house ....... I ordered you to vacate the house so we could sell the property. . . . I am offended by this testimony because I consider it to be untruthful." Joseph never did pay the amounts ordered by the court as a consequence of being held in contempt of court. The final account shows that Netter ultimately had to recoup those administrative expenses by deducting them from the amount disbursed to Joseph.
Joseph's other claim is that she should be reimbursed for the storage fees she paid after putting some of her mother's movable property in a storage unit. The only expenses for which a co-owner is entitled to be reimbursed are those that are necessary for the preservation of the estate property. However, under the circumstances of this case, we agree with Netter that there was no necessity for storing the home furnishings, since Joseph and her daughter were staying in the house. Their presence there would have obviated whatever legitimate concerns Joseph may have had about vandalism of the residence. Moreover, pleadings filed by Netter indicate that after she finally obtained access to the storage unit and the house, there were a number of furnishings and appliances that could not be accounted for. Eventually, the heirs agreed among themselves concerning the distribution of the remaining movable property, and Netter sought court approval for putting the heirs into possession in accordance with those choices.
We conclude that the court did not err in approving the homologation of the tableau of distribution and final account filed by the administratrix. As noted above, those accountings are adjusted to eliminate the contempt of court finding and the imposition of punishment in the form of $1000 in attorney fees.

CONCLUSION
For the reasons described above, we reverse that portion of the judgment of May 11, 2005, finding Joseph to be in contempt of court and ordering her to pay $1000 in attorney fees as punishment. We amend the homologation in the March 6, 2006 judgment accordingly. In all other respects, we affirm the judgments and assess all costs of this appeal to Joseph.
MAY 11, 2005 JUDGMENT REVERSED IN PART AND AFFIRMED IN PART.
MARCH 6, 2006 JUDGMENT AMENDED AND AFFIRMED AS AMENDED.
NOTES
[1] The order shows a signing date of December 29, 2005. However, the file-stamp date is shown as 2004, and the evidentiary hearing was set for January 31, 2005.
[2] Joseph testified that she had already moved in January 2005, due to the constant disturbances by the realtor and Netter.
[3] On April 18, 2006, a judgment of possession sent the heirs into possession of their undivided interests in the succession. On April 17, 2006, Netter filed a first and final account. A judgment homologating the first and final account was signed May 10, 2006.
[4] The first and final account reimbursed Joseph for the mortgage payments she paid from the date of her mother's death until July 26, 2004, when the court ordered her to continue paying the mortgage, since she was living in the house.
[5] At the time this contempt judgment was rendered in May 2005, LSA-C.C.P. art.2083 stated that an appeal could be taken from an interlocutory judgment that could cause irreparable injury. Article 2083 was amended by 2005 La. Acts, No. 205, which had an effective date of January 1, 2006. The Wooley case concluded that the amendment was to be applied retroactively for matters appealed after the effective date. Wooley, 944 So.2d at 674. Therefore, even though the contempt judgment in this case was rendered before the effective date of the amendment to Article 2083, we must apply its provisions retroactively.