FREDERICKA HOMBERG WICKER, Judge.
| ¿This ⅛ an appeal from a judgment holding the appellants in constructive contempt of a consent judgment and amending that consent judgment. The appeal arises from an inchoate interdiction pro *57 ceeding in which Charles R. Jones (Mr. Jones) sought to interdict his mother, Jeannette W. Jones (Mrs. Jones), who was 94 years of age at the time of the petition. Four of the 12 children — Cynthia Jones (Cynthia), Marybelle Jones Carter (Mary-belle), Claudette Jones Hills (Claudette), and Henry 0. Williams (Henry) — filed an opposition to the interdiction. After the interdiction was partially tried, the parties, including Mrs. Jones’s counsel, entered into a consent judgment that was made the judgment of the court. Later, Mr. Jones filed a rule for contempt and motions to vacate the consent judgment and to render a new judgment. The trial judge found Cynthia, Marybelle, and Claudette,[1] appellants, in contempt and she amended the consent judgment. The appellants now appeal.[2] Mr. Jones, appellee, filed a motion to dismiss the appeal as untimely. For the reasons that follow, we grant the motion to dismiss in part and deny it in lspart. We dismiss as untimely the appeal from the amended consent judgment but address the merits of the timely appeal from the contempt judgment.[3] On the merits, we affirm the contempt judgment as amended.

Timeliness of the Appeal

Before we reach the main issues, we address Mr. Jones’s motion to dismiss the appeal as untimely.
Two judgments were rendered in this matter — the consent judgment dated October 23, 2008 (Judgment I) and the judgment on appeal rendered June 30, 2009 (Judgment II). It is undisputed that the parties entered into a consent judgment that was made the judgment of the court on October 23, 2008.
Judgment II — the subject of this appeal — consists of two judgments. It consists of the judgment of a constructive contempt for violation of an order of the court and the judgment amending Judgment I.
We first address the contempt judgment.
Courts have considered contempt judgments to be final and appealable on two grounds.
First, courts have found statutory authority for the appeal. “A final judgment is appealable in all causes in which appeals are given by law, whether rendered after hearing, by default, or by reformation under Article 1814.” La.C.C.P. art. 2083(A). “An interlocutory judgment is appealable only when expressly provided by law.” La.C.C.P. art. 2083(C). Prior to the 1999 amendments to La.C.C.P. art. 1915, a contempt judgment was considered an interlocutory decree, renewable only on application for supervisory writs. Stiltner v. Stiltner, 1400-2079, p. 1 (La.App. 4 Cir. 11/8/00), 772 So.2d 909, 910 (citations omitted). However, La.C.C.P.1915(A)(6) now considers certain enumerated judgments as final appealable judgments. These include: “[Wjhen the court imposes sanctions or disciplinary action pursuant to Ar *58 ticle 191, 863, or 864 or Code of Evidence Article 510(G).” La.C.C.P.1915(A)(6). La.C.C.P. art. 191 states: “A court possesses inherently all of the power necessary for the exercise of its jurisdiction even though not granted expressly by law.” The court’s inherent power includes the power to punish for contempt. See: State ex rel. Phelps v. Judge of Civil District Court, 45 La.Ann. 1250, 14 So. 310 (La.1893). Articles 863, 864 and 510(G) refer to contempt or sanctions. Thus, relying on Article 1915(A)(6), courts have held that a contempt judgment is now considered a final judgment, subject to appeal. Stiltner, at 2, 91, 772 So.2d 909; Hodges v. Hodges, 02-0489, p. 8 (La.App. 3 Cir. 10/2/02), 827 So.2d 1271, 1276, writ denied, 02-2485 (La.11/8/02), 828 So.2d 1122. But see: Succession of Bell, 06-1710, pp. 6-7 (La.App. 1 Cir. 6/8/07), 964 So.2d 1067, 1072 (Court did not discuss Article 1915 but concluded “[tjhere is no statute allowing an immediate appeal of a judgment of contempt.”).
Second, where the object of the proceedings before the court, as in this case, is to hold someone in contempt for violating the orders of the court, a direct appeal has been held to be an appropriate remedy since, in those instances, the trial court judgment would be final. Pittman Const. Co., Inc. v. Pittman, 96-1079 (La.App. 4 Cir. 3/12/97), 691 So.2d 268, 269, writ denied, 97-0960 (La.5/16/97), 693 So.2d 803. “For example, a judgment on a rule to hold a spouse in contempt for failure to meet court ordered support obligations would be a final, appealable judgment even though it is technically a contempt judgment.” Id. This court in Thibodeaux v. Thibodeaux, 99-618, p. 1 (La.App. 5 Cir. 11/10/99), 748 So.2d 1180, 1181 adopted the Pittman view. We held: “Because the contempt judgment complained | fiof here is one for violation of an order of the court, it is final and therefore appealable.” Id. Accord: Parish of St. Charles ex rel. Dept. of Planning and Zoning v. Bordelon, 08-385, p. 2 (La.App. 5 Cir. 10/28/08), 998 So.2d 751, 752.
Thus, in light of Thibodeaux and Bordelon, the instant contempt judgment is final and appealable. Moreover, the appeal from the contempt judgment is timely because it was taken well within the delays for taking a 60-day devolutive appeal. Thus, we deny Mr. Jones’s motion in part as it pertains to the contempt judgment.
The appeal from the amended judgment, however, is untimely. For the reasons that follow, we find that the amended judgment constitutes an amendment of a consent judgment that effectively interdicts Mrs. Jones. Thus, the modification judgment of that interdiction is subject to the delays for filing a 30-day appeal.
In Judgment I, the trial judge made no finding that Mrs. Jones was interdicted. She did, however, issue an order that effectively interdicted Mrs. Jones. The judgment appointed various curators over Mrs. Jones’s person and property. It also provided that any juridical acts Mrs. Jones desired to take would be reviewed and approved by the trial judge. Richard Jones, Jr. (Richard) was appointed curator to administer any and/all financial matters and financial interests of Mrs. Jones. However, the judgment ordered that Mar-ybelle and Richard would be co-signatories on any and/all financial accounts of Mrs. Jones, such that both individuals’ signatures would be required for the distribution of any funds or to affect the financial interest of Mrs. Jones. Judgment II ordered that Richard shall have exclusive authority over all financial matters relating to Mrs. Jones, which includes his exclusive authority to execute, solely, checks and instruments relating to Mrs. Jones.
*59 |fiIn Judgment I, Marybelle and Miriam Jones Milton (Miriam) were appointed curators for the daily care giving and needs of Mrs. Jones. Judgment II modified Judgment I to state that Miriam, Patricia J. Amedee and Marybelle, along with the other siblings and grandchildren, were to provide for the day-to-day care of Mrs. Jones.
In Judgment I, Dr. Warren Jones (Dr. Jones) was appointed curator for the medical care and administration of any and/all issues and/or interests relating to the medical care of Mrs. Jones. Judgment II further provided that Dr. Jones shall be immediately notified of any and all medical appointments of Mrs. Jones, except for medical emergencies, and that immediate notice is to be given by all parties to their siblings relating to any and all medical emergencies of Mrs. Jones.
“Owners of private things may freely dispose of them under modifications established by law.” La.C.C. art. 454. “All natural persons enjoy general legal capacity to have rights and duties.” La.C.C. art. 27. “All persons have capacity to contract, except unemancipated minors, interdicts, and persons deprived of reason at the time of contracting.” La.C.C. art.1918. “A natural person who has reached majority has capacity to make all sorts of juridical acts, unless otherwise provided by legislation.” La.C.C. art. 28.
The Legislature has, however, provided a means for a person to be interdicted, who is unable to take care of his or her person. La.C.C. art. 389. La.C.C. art. 389 authorizes a court discretion to “order the full interdiction of a natural person of the age of majority, or an emancipated minor, who due to an infirmity, is unable consistently to make reasoned decisions regarding the care of his person and property, or to communicate those decisions, and whose interests cannot be protected by less restrictive means.” Or, a court may order a limited interdiction. La.C.C. art. 390. La.C.C. art. 392 permits the appointment of a 17curator to represent the interdict in juridical acts and to care for the person or affairs of the interdict, or any aspect of either.
The effects of an interdiction are these:
A full interdict lacks capacity to make a juridical act. A limited interdict lacks capacity to make a juridical act pertaining to the property or aspects of personal care that the judgment of limited interdiction places under the authority of his curator, except as provided in Article 1482 or in the judgment of limited interdiction.
La.C.C. art. 395.
Despite appellants’ statement in brief that the parties did not intend that Mrs. Jones be interdicted, the consent judgment provided otherwise. It provided that any juridical acts Mrs. Jones desired to take would be reviewed and approved by the trial judge, thereby removing her capacity to make juridical acts as legislatively provided for by interdiction. See: La.C.C. art. 28 and La.C.C. art. 389.
Since the former judgment provided that any juridical acts Mrs. Jones desired to take would be reviewed and approved by the trial judge, the judge necessarily found that Mrs. Jones “lack[ed] capacity to make a juridical act,” thereby rendering a judgment of interdiction. Consequently, the amended consent judgment was a judgment modifying the interdiction.
We are unpersuaded by appellants’ contention that because the consent judgment failed to comply with certain formalities for an interdiction judgment, there was no *60 judgment of interdiction.[4] In particular, appellants assert that the qualification of curators was not included in the judgment. La.C.C.P. art. 4562, however, provides remedies for problems with qualification.[5]
| sHaving found that the current amended judgment is a modification of a consent judgment of interdiction, we now consider the timeliness of the appeal.
La. C.C.P. art. 4555 provides the following appeal delay from a judgment modifying interdiction:
An appeal from a judgment of interdiction, an order or judgment appointing or removing a curator or undercurator, or a judgment modifying or terminating interdiction shall be taken within thirty days from the applicable date provided by Article 2087. The order or judgment is not suspended during the pendency of an appeal. The acts of a curator or an undercurator shall not be invalidated by the annulment of his appointment on appeal.
Thus, the appeal “may be taken” within 30 days of the following:
The expiration of the delay for applying for a new trial or judgment notwithstanding the verdict, as provided by Article 1974 and Article 1811, if no application has been filed timely.
La.C.C.P. art. 2087(A)(1).
The judgment in this case was rendered on June 30, 2009. The notice of signing judgment was issued by the clerk on July 1, 2009. There was no application for new trial. La.C.C.P. art.1974 provides: “The delay for applying for a new trial shall be seven days, exclusive of legal holidays. The delay for applying for a new trial commences to run on the day after the clerk has mailed, or the sheriff has served, the notice of judgment as required by Article 1913.” The expiration of the delay for applying for a new trial occurred on July 10, 2009.
The appellants filed their motion for appeal on August 11, 2009, well within the delay for taking a 60-day devolutive appeal but one day late for taking a 30-day appeal as required by Article 4555. Thus, we grant Mr. Jones’s motion in part and [9dismiss the appeal from the amended consent judgment as untimely. Accordingly, the appellants’ specifications of error as to the amended consent judgment, including the alleged improper cumulation of the motion to vacate the judgment with the motion for contempt, are rendered moot.
We note that appellants are not precluded from seeking further modification of the consent judgment upon the proper show *61 ing.[6]

Contempt Proceedings

Approximately five months after the consent judgment, Mr. Jones filed a rule for contempt in which he asserted that Cynthia, Claudette, and Marybelle engaged in actions that were designed to defeat that judgment.
The trial judge found Marybelle in contempt of court for failing to provide medical information to Dr. Jones; withdrawing funds from the mother’s account without authorization; and, refusing to allow visiting by her siblings with their mother. She found Cynthia and Claudette in contempt for taking funds from the mother’s account.
After finding Marybelle in contempt for withdrawing funds from Mrs. Jones’s account without Richard’s consent, the trial judge ordered Marybelle’s name to be immediately removed from any and all of Mrs. Jones’s accounts. The court ordered that Marybelle was prohibited from taking Mrs. Jones to any bank | ^without specifically being accompanied by Richard. Mar-ybelle was ordered to pay $250 in “attorney fees.”
After finding Claudette and Cynthia in contempt of court for taking money from Mrs. Jones’s account, the trial judge ordered that Claudette and Cynthia were to return to Mrs. Jones via Richard the sum of $5000 each within 30 days of the judgment. They were ordered to pay $250 in “attorney fees” within 30 days of the judgment.
The following children testified at the hearing or submitted an affidavit in lieu of testimony: Marybelle, Cynthia, Dr. Jones, Mr. Jones, Richard, and Henry (by affidavit).

The Withdrawals

The trial judge heard conflicting testimony regarding whether Richard, the curator appointed to administer any and/all financial matters and financial interests, authorized withdrawals of $1000 and $10,000 from Mrs. Jones’s accounts. Richard denied authorizing the withdrawals. With regard to the $10,000 withdrawal, Marybelle and Cynthia testified that Richard agreed to the withdrawal. With regard to the $1000 withdrawal, Marybelle testified that Richard typically authorized her to pay Mrs. Jones’s bills and that this money went to Mrs. Jones’s care and bills. Richard, however, testified that he authorized at most $400 and that he never authorized a check total amount of $1000 for payment of bills.
Marybelle testified that after the consent judgment, there were withdrawals from Mrs. Jones’s New Orleans’ savings accounts on January 23, 2009 and March 6, 2009 of $1000 and $30,000, respectively. *62 Marybelle and Mrs. Jones were the only parties present for these transactions. Those withdrawals contained Mrs. Jones’s signature. Richard, however, accompanied Marybelle and Mrs. Jones, when, on February 18, 2009, they opened new checking and savings accounts for |nMrs. Jones at J.P. Morgan Chase Bank in New Orleans. He stated that the delay was due to his difficulty obtaining information from Marybelle — information needed to establish the appropriate accounts. He did not learn about the accounts until the end of February or March. According to Richard, however, the Chase account was opened on March 4, 2009 — two days before the contested March 6, 2009 withdrawal of $10,000 from Liberty Bank.
Marybelle and Richard testified that Mrs. Jones’s funds were later transferred to the Chase Bank. According to Richard, the funds were transferred in March or April 2009. Marybelle stated that although the consent judgment required Marybelle’s and Richard’s co-signatures for checks, that condition could not be met until Richard accompanied them to open the Chase accounts. The transfer of funds into the new Chase accounts required the closing of Mrs. Jones’s New Orleans Liberty Bank and Trust Co. savings bank account.
Marybelle stated that between the time of the consent judgment and the opening of the Chase account, there were several occasions when she verbally requested Richard’s approval for paying Mrs. Jones’s bills. Richard and Marybelle testified that Richard approved certain withdrawals for the payment of Mrs. Jones’s bills, such as medical bills.
Marybelle testified that there was a $1000 withdrawal on January 28, 2009. She had informed Richard that she and Mrs. Jones were going to the bank on that date but she did not think it was necessary to tell Richard the exact amount of the withdrawal — $1000. However, she sent Richard an e-mail around that time asking him to accompany them to the bank, but she did not recall why Richard could not accompany them. She did not tell Richard the amount of the withdrawal because at the time she spoke to him she had not determined a definite amount. She explained that Mrs. Jones wanted extra cash at the house at the time that the $1000 112withdrawal was made. She did not recall at the time of the hearing the portion that was spent on bills.
Richard, who resides in Atlanta, Georgia, testified that the funds that were in Mrs. Jones’s account should have been transferred to one account before any disbursements were made. He also testified that he admitted having a conversation with Marybelle about paying a bill although he was uncertain of its nature. He thought the amount was around $300 or $400. He did not give authorization for the $1000 withdrawal. Rather, he thought he was authorizing a withdrawal of $400 at most. He also authorized Marybelle to write other checks for Mrs. Jones’s medical bills.
Marybelle testified that at the time that Richard accompanied Marybelle and Mrs. Jones to open the Chase account, Mary-belle gave Richard a copy of a letter that was signed by Mrs. Jones. According to Marybelle, Mrs. Jones apprised Richard of its contents. She also stated that Mrs. Jones had previously mentioned to Richard the desires that she expressed in that letter.
Cynthia, a California resident, testified that on March 9, 2009, she placed a $5000 deposit into her account from money that came from Mrs. Jones through Marybelle. Marybelle sent her a cashier’s check in that amount. Cynthia believed that Richard had authorized that withdrawal from *63 Mrs. Jones’s account. She based her belief on the letter that was shown to Richard. The purpose of the letter was to let Richard know that Mrs. Jones wanted Cynthia to have $5000. Cynthia actually wrote the words for her mother.
The letter dated February 13, 2009 was introduced into evidence. Cynthia explained that she typed the letter for Mrs. Jones based on her mother’s wishes. The letter stated that it was written by “Mama” to “Richard.” The letter expressed that the writer wanted to send “Claudy” $5000 to help with her expenses for | 1scoming to support Mrs. Jones during the two court appearances Mrs. Jones made in the interdiction matter. It further stated that the writer wanted to send “Cynthia” $5000 for helping Henry to come and support Mrs. Jones during that time. The writer explained that when Richard, Marybelle, and Mrs. Jones went to the bank during Mardi Gras, Mrs. Jones wanted to have cashier’s checks made out to Claudy and Cynthia for $5000 each.
Cynthia acknowledged that under the consent judgment, Richard must give authorization for a financial transaction to occur. She stated that she knew the letter had been given to Richard when Richard, Mrs. Jones, and Marybelle went to the bank. Cynthia was told that Richard did not say anything when he read the letter. Because of his silence and because Richard was present along with Marybelle and Mrs. Jones at the time the letter was given to Richard, Cynthia considered those circumstances to constitute authorization for the withdrawal.
Marybelle testified that Mrs. Jones and Richard had a conversation when he accompanied them to the bank. She testified that Richard did not say anything.
Cynthia testified that after she deposited the money on March 9, Richard sent her a letter that was dated March 18, 2009. According to Cynthia, she understood from the letter that Richard was acknowledging his awareness of the mother’s request and that he authorized the $5000 withdrawal to Cynthia.
The letter from Richard, which was introduced into evidence, stated:
It is my understanding that you recently received a Cashier’s Check in the amount of $5000 from Marybelle from Mom’s Liberty Bank Savings Account. I received the letter from Mom requesting that I send you a check in that amount. While it was my intent to comply with Mom’s letter, I felt it was better to consolidate all of Mom’s funds in one bank before beginning disbursement. While I did not authorize sending the check as it was done, I understand why Marybelle did it. To make sure that I follow the Court Order and send each of Mom’s children a quarterly statement of Mom’s finances, I need information from you about those funds.
| HCynthia explained that the $5000 was given to her by her mother to compensate her for transportation and lodging costs for Henry and Cynthia. She applied the $5000 to some of her expenses.
Richard denied authorizing the $5000 withdrawals that were given to Cynthia and Claudette. He acknowledged that he read the letter wherein Mrs. Jones purportedly expressed her desire to send Claudette and Cynthia $5000 each. He testified that the letter was given to him when they went to the bank on March 4, 2009 to open an account at Chase. According to Liberty Bank’s documentation, the money was withdrawn two days later on March 6, 2009.
Richard testified that he concluded that his mother knew nothing about the letter after he asked his mother questions regarding its contents. He decided to do *64 nothing about the request until they had finished moving the money into the account. He did not say anything to Mary-belle. Rather, he told his mother he would discuss the matter with her at a later time.
Richard stated that he sent a letter to Cynthia dated March 18, 2009. When asked whether the letter was for the purpose of post-authorizing the withdrawal of funds, he replied “absolutely not.” At the time he sent the letter to Cynthia, the money was already withdrawn from Mrs. Jones’s account. So, he was attempting to obtain documentation in order to account to all of his sisters and brothers for the money that had been in his mother’s account. He learned on the week after the withdrawals that the money had been moved. Of the $30,000 that was withdrawn from the Liberty bank, $20,000 was deposited in the Chase Bank in his mother’s savings account. The remainder of the money was made out in $5000 checks to Cynthia and Claudette, respectively. He was adamant that he did not authorize those $5000 checks. He believed there was nothing he could do after the fact other than request an accounting of the two $5000 payments.
11 r,Richard further testified that despite asking Marybelle for an itemization of the mother’s monthly expenses, Marybelle has not done so. He also testified that he did write a check after the consent judgment without Marybelle’s signature. He wrote one check to the curator at the court’s direction. He also made some withdrawals without Marybelle’s signature. These were withdrawals for reimbursement for his expenses in 2007 and 2008. The withdrawals were made around March 2009. He did not obtain Marybelle’s signature because she was not on the account.

Medical Information and Visitation

The trial judge heard conflicting testimony regarding whether Marybelle prevented some children from visiting the mother and whether she failed to provide Dr. Jones with medical information.
Henry’s affidavit was introduced into evidence. According to Henry and Cynthia, Marybelle never interfered with their communication with Mrs. Jones. Henry attested that Marybelle encouraged all of the children to communicate with Mrs. Jones. Cynthia testified that when she visited her mother, the other children had not visited on that occasion.
Marybelle testified that part of her duties as curator for the daily caregiving of her mother was to have the mother interact with all of her children. She agreed that it was incumbent upon her as a daily caregiver to make certain that if one of her siblings called to see the mother, she would coordinate that visit. She denied she ever prevented visitation. She said that no one called to say that they were coming to visit the mother. However, if one of the siblings walked into the house without knocking, she would say that the mother was in the bathroom and she would not engage in any further dialogue such as asking the sibling to return.
| ^Marybelle stated that she never prevented Dr. Jones from visiting with Mrs. Jones.
On the other hand, Dr. Jones, a resident of Mississippi, testified that he was denied entrance into the residence where Miriam and Mrs. Jones resided. Miriam resided on the other side of the house. It was not unusual for him to visit his mother on a monthly basis. He described a visit where the door was locked. He knocked but no one approached the door. He had a key and opened the door. He was told he should have called first. On another occasion, in January 2009, the door was locked again although someone was home. When he knocked and disclosed his presence, he *65 was told that the mother was in the bathroom. No one told him to come back later. And, no one told him he could wait. He stood at the door approximately 10 to 12 minutes before leaving.
He attempted a visit in February 2009. He knocked on the door but the door was locked. So, he went to Miriam’s side and when he attempted to visit with his mother on the opposite side, he discovered that the car was gone and that Marybelle and Mrs. Jones were no longer there. He stated that when he first arrived, the two women were present.
Dr. Jones testified that Mr. Jones accompanied Dr. Jones on Dr. Jones’s last visit in April 2009. Together they knocked on the door but had called beforehand. Marybelle told Mr. Jones that the mother was in the bathroom. After arriving, the two men stood at the door for 15 to 20 minutes. They tried the key but found that the door was barricaded. Dr. Jones explained that all of the siblings had a key to get into the mother’s house. There was no problem in the past. He described multiple occasions where he was denied access to his mother. He stated that visitation progressively deteriorated from having no locked doors to a barricaded door. Furthermore, there had been no requirement that the children call prior to |i7visiting. However, Marybelle testified she knew nothing about a barricaded door. In addition, Marybelle testified that she thought it was necessary to lock the inner door of Mrs. Jones’s apartment for security reasons.
Mr. Jones’s testimony regarding the difficulties visiting the mother was corroborated by Dr. Jones.
There was also testimony regarding reported difficulties obtaining medical information, which Marybelle disputed.
Richard testified that he spoke with Marybelle on three different occasions regarding the consent judgment’s requirement that Marybelle inform Dr. Jones concerning Mrs. Jones’s medical matters.
Marybelle testified that the consent judgment appointed Dr. Jones curator for Mrs. Jones’s medical care and administration of all issues relating to that medical care. Even so, she admitted that she had taken her mother to two post-consent judgment Tulane University medical appointments and she did not know if Dr. Jones had any knowledge of those visits. She had no idea why Dr. Jones had not been consulted about these visits. She explained that she never really communicated with Dr. Jones before the consent judgment-the' communication was not there. Also, she stated that Dr. Jones did not know that Dr. Markesha Fleury was Mrs. Jones’s internist until Cynthia sent an e-mail to Mrs. Jones’s children.
Dr. Fleury testified that she saw Mrs. Jones for the first time around January 2009. She saw her on several occasions in 2009. Had she known there was an order stating that Dr. Jones was the appointed curator for the medical care, she would have called him to discuss the treatment that she rendered. She stated that Mary-belle never provided her with information on how to get in touch with Dr. Jones until the last visit.
| iSDr. Jones testified that he was not notified of any of Mrs. Jones’s visits with Dr. Fleury. Furthermore, no physician ever contacted him about the mother’s care. He was unaware of the Tulane University medical visits that took place after the consent judgment until they were in court on the last occasion. Also, on one occasion he saw his mother wearing a wrist splint and a knee splint but he was unaware of the care that was being given.
*66 Dr. Jones stated that after the consent judgment, he asked Marybelle for the names and addresses of Mrs. Jones’s doctors. Marybelle produced a bag of old prescription bottles that predated Hurricane Katrina and told him that those were the medications the mother was taking and the names of her doctors were written there. In contrast, Marybelle testified that she provided Dr. Jones with current information when she gave him the medications. She further stated that Dr. Jones never asked for names and telephone numbers of the doctors. She said that she provided a list of doctors and telephone numbers and asked Cynthia to forward the list through e-mail to everyone.
Cynthia and Marybelle testified that Cynthia sent the e-mail on February 20, 2009 to everyone at Marybelle’s direction. Marybelle prepared the e-mail but Cynthia forwarded it to everyone because Mary-belle did not have all of the e-mail addresses.
Dr. Jones testified that he found it very difficult to fulfill his duties and obligations as a medical curator without seeing his mother face-to-face at least on some occasions. He gained information about the mother from others. He testified that in the four months prior to the February 20, 2009 e-mail, he was never advised that those listed doctors were seeing his mother. In addition, the e-mail did not inform him as to whether the doctors were actually treating the mother, the time of the visits, and the purposes for those visits. Moreover, the e-mail did not indicate | |9that the doctors were made aware that they needed to contact Dr. Jones. He received an e-mail from Cynthia with the names of the mother’s doctors a week before they were due to come to court. That e-mail was the only communication he has had about the medical care that was given to his mother.
Marybelle stated that she believed the consent judgment imposed no requirement on her to contact Dr. Jones for each doctor’s visit. Rather, she thought that Dr. Jones was going to contact Marybelle.

Analysis

“A contempt of court is any act or omission tending to obstruct or interfere with the orderly administration of justice, or to impair the dignity of the court or respect for its authority.” La.C.C.P. art. 221. There are two kinds of contempts of court: direct and constructive. Id. The willful disobedience of any lawful judgment or order of the court constitutes a constructive contempt of court. La.C.C.P. art. 224(2), “A person may not be adjudged guilty of a contempt of court except for misconduct defined as such, or made punishable as such, expressly by law. The punishment which a court may impose upon a person adjudged guilty of contempt of court is provided in R.S.13:4611.” La.C.C.P. art. 227.
The appellants were found in contempt for the willful disobedience of a court order, which constitutes constructive contempt of court. La. C.C.P. art. 224(2). “A contempt of court proceeding is either criminal or civil, which is determined by what the court primarily seeks to accomplish by imposing sentence.” Billiot v. Billiot, 01-1298, p. 4 (La.1/25/02), 805 So.2d 1170, 1173 citing Shillitani v. United States, 384 U.S. 364, 370, 86 S.Ct. 1531, 1535, 16 L.Ed.2d 622, 627 (1966). “In a criminal contempt proceeding, the court seeks to punish a person for disobeying a court order, whereas in a civil contempt proceeding, the court seeks to force a person into compliance with a court order.” Id., citing State in the Interest of R.J.S., 493 So.2d 1199, 1202 & n. 7 (La.1986) (citing Shillitani, 384 U.S. 364, 86 S.Ct. 1531, 16 L.Ed.2d 622 (1966)).
*67 In the present case, the trial judge not only imposed attorney’s fees as the punishment for violating the consent judgment, she also rendered other rulings seeking to force the appellants into compliance with the consent judgment. In order to force compliance, she rendered the following rulings: (1) she ordered Claudette and Cynthia to return to Mrs. Jones, via Richard, the sum of $5000 each within 80 days of the judgment; (2) she ordered Marybelle’s name to be immediately removed from any and all accounts of Mrs. Jones’s; and (8) she ordered Marybelle not to take Mrs. Jones to any bank without specifically being accompanied by Richard. Through these orders, the trial judge was seeking to force compliance with the consent judgment. Since the trial judge’s intent was to have the funds restored and to force compliance with the earlier judgment, we find that the contempt proceedings were civil in nature. Compare: Parish of Jefferson v. Lafreniere Park Foundation, 98-345, p. 9 (La.App. 5 Cir. 9/15/98), 720 So.2d 359, 365, writ denied, 98-2598 (La.10/28/98), 723 So.2d 965 (Contempt proceedings were civil in nature where judge’s intent was to have the funds restored and to force compliance with the earlier judgment).
In a civil contempt, the stringent criminal burden of proof and standard for appellate review do not apply. Id. The burden of proof for civil contempt is by a preponderance of the evidence and appellate review is by the manifestly erroneous standard. Id.[7]
| 21To find a person guilty of constructive contempt, it is necessary to find that he violated the order of court intentionally, knowingly and purposefully, without justifiable excuse. Brunet v. Magnolia Quarterboats, Inc., 97-187 (La.App. 5 Cir. 3/11/98), 711 So.2d 308, writ denied, 98-0990 (La.5/29/98), 720 So.2d 343, cert. denied, Polaris Ins. Co., Ltd. v. Brunet, 525 U.S. 1104, 119 S.Ct. 869, 142 L.Ed.2d 771 (1999) (Citations omitted). Proceedings for contempt must be strictly construed, and the law does not favor extending their scope. Id. (Citation omitted).
In determining whether the parties intentionally, knowingly and purposefully, without justifiable excuse, violated a court order, the trial judge is vested with great discretion. Lafreniere Park Foundation, supra (citation omitted).
After reviewing this record, we conclude that the trial judge was not manifestly erroneous and did not abuse her vast discretion in finding that Marybelle, Cynthia, and Claudette intentionally, knowingly and purposefully, without justifiable excuse, violated a court order.

Claudette and Cynthia

The appellants argue that the judgment simply imposed upon Marybelle and Richard certain conditions to withdrawal of funds, and it did not expressly prohibit Claudette and Cynthia from accepting money from Marybelle (based on their mother’s desire) for reimbursement of their expenses and for the support given during the prior interdiction proceedings.
Unless a litigant willfully disobeys a direct order of the court issued prior to *68 the contempt rule, he should not be held in contempt, even if his acts tend to frustrate the opposing litigant. Hodges v. Hodges, 02-0489 (La.App. 3 Cir. 10/2/02), 827 So.2d 1271, writ denied, 02-2485 (La.11/8/02), 828 So.2d 1122, citing State ex rel. Duffy and Behan v. Civil District Court for Parish of Orleans, 112 La. 182, 36 So. 315 (1904).
122The jurisprudence interpreting La. C.C.P. art. 224(2) is clear that a party cannot be held in contempt unless he has been given a direct order of the court and he has willfully disobeyed or refused to honor this order. Klein v. Copeland, 482 So.2d 613, 616 (La.1986) (per curiam) citing Ferry v. Ferry, 444 So.2d 797 (La.App. 3 Cir.1984); Nelson v. Nelson, 421 So.2d 366 (LaApp. 1 Cir.1982); City of Monroe v. Evans, 385 So.2d 912 (La.App. 2 Cir.1980).
In this case, the trial judge stated on the record of the current proceedings that everyone entered into the consent judgment. No one disputed her statement. The consent judgment signed by the trial judge became a legal judgment. As a final, valid judgment, such an agreement may be punished by contempt. Parish of Jefferson v. Lafreniere Park Foundation, 98-345, p. 6 (La.App. 5 Cir. 9/15/98), 720 So.2d 359, 363-64, writ denied 98-2598 (La.10/28/98), 723 So.2d 965 (citation omitted). It follows that since Claudette and Cynthia were parties to the consent judgment, they were bound by its terms. Claudette and Cynthia agreed by their participation in the consent judgment that Richard was appointed to administer any and/all financial matters and financial interests of Mrs. Jones. And, Richard’s signature on checks was required for the distribution of funds.
The trial judge heard conflicting testimony regarding Richard’s alleged consent. The trial judge evidently attached greater weight to Richard’s testimony that he did not consent to the withdrawal and disbursement of the funds to Claudette and Cynthia.
The manifest error standard of review precludes the setting aside of a district court’s finding of fact unless that finding is clearly wrong in light of the record reviewed in its entirety. Hall v. Folger Coffee Co., 03-1734, p. 9 (La.4/14/04), 874 So.2d 90, 98. Thus, a reviewing court may not merely decide if it would have found the facts of the case differently. Id. (Citation omitted). The reviewing court | ^should affirm the district court where the district court judgment is not clearly wrong or manifestly erroneous. Id.
In order to reverse a trial court’s determination of fact, an appellate court must review the record in its entirety and (1) find that a reasonable factual basis does not exist for the finding, and (2) further determine that the record establishes that the factfinder is clearly wrong or manifestly erroneous. The appellate court must be cautious not to re-weigh the evidence or to substitute its own factual findings just because it would have decided the case differently. Pinsonneault v. Merchants & Farmers Bank & Trust Co., 01-2217, p. 11 (La.4/3/02), 816 So.2d 270, 278-79 (citations omitted). Thus, where two permissible views of the evidence exist, the factfinder’s choice between them cannot be manifestly erroneous or clearly wrong. Id. at 11-12, 816 So.2d at 279 (citations omitted).
Here, our review of the record indicates that the trial judge was presented with two permissible views concerning whether Richard authorized the $10,000 withdrawal and disbursement of funds to Claudette and Cynthia. The trial court’s finding that Richard did not authorize the *69 withdrawal and disbursement of the funds to Claudette and Cynthia was not manifestly erroneous. It is not the role of the appellate court to second guess the trier of fact’s determination in this regard, but to review that determination for clear error. Id. at 12, 816 So.2d at 279. Accordingly, the trial judge was not manifestly erroneous in finding Claudette and Cynthia in contempt for willfully disobeying or refusing to honor the court order to which they consented.
For the reasons stated below, we also find that the trial judge properly held Marybelle in contempt for withdrawing the funds in direct violation of the court order.

124Marybelle

The trial judge found Marybelle in contempt of court for various reasons. We first consider the withdrawals.
The consent judgment appointed Richard to administer any and all financial matters and financial interests of Mrs. Jones. Furthermore, Richard’s signature on checks was required for the distribution of funds. When his signature could not be obtained or when he was not a signatory on an account, Marybelle still had the obligation under the judgment to obtain his authorization for disbursement.
The trial judge found Marybelle in contempt of court for withdrawing $1000 from Mrs. Jones’s account without authorization from Richard. Marybelle testified that she did not ask Richard to authorize that specific amount. Richard stated that at most, he authorized $400. Since it is undisputed that Marybelle did not provide Richard with a request to withdraw the sum of $1000, the trial judge was not manifestly erroneous in finding Marybelle in contempt.
Next, the trial judge found Marybelle in contempt of court for withdrawing $10,000 from Mrs. Jones’s account without authorization from Richard. Marybelle and Cynthia testified that Richard authorized the withdrawal — a fact that Richard disputed. The trial judge evidently attached greater weight to Richard’s testimony. As stated previously, we find no manifest error in the trial judge’s finding.
Finally, Marybelle argues that the trial judge erred in holding her in contempt for preventing visitation with her siblings and in expecting Marybelle to contact Dr. Jones regarding the mother’s medical care. Again, our review the record indicates trial judge was presented with two permissible views concerning these issues. We find no manifest error in the trial judge’s credibility determination and holding Marybelle in contempt.

12^Attorney’s Fees

The appellants argue that the trial court erred in ordering them to pay attorney’s fees of $250. For the reasons that follow, we amend the portion of the trial court judgment awarding $250 in attorney’s fees.
An award of attorney fees is a type of penalty imposed not to make the injured party whole, but rather to discourage a particular activity on the part of the opposing party. Langley v. Petro Star Corp. of La., 01-0198, p. 3 (La.6/29/01), 792 So.2d 721, 723 (citation omitted). Attorney fees are not awarded generally in Louisiana unless authorized by statute or provided by contract. Rivet v. State, Dept. of Transp. and Development, 96-0145 (La.9/5/96), 680 So.2d 1154, 1160.
“The punishment which a court may impose upon a person adjudged guilty of contempt of court is provided in R.S. 13:4611.” La.C.C.P. art. 227. Thus, La. C.C.P. art. 227 limits the punishment for contempt to that set forth in La. R.S. 13:4611. The pertinent provision in La. R.S. 13:4611, applicable here, provides for a fine of not more than five hundred dol *70 lars, or imprisonment for not more than three months, or both:
Except as otherwise provided by law:
(1) The supreme court, the courts of appeal, the district courts, family courts, juvenile courts and the city courts may punish a person adjudged guilty of contempt of court therein, as follows:
[[Image here]]
(d) For any other contempt of court, including disobeying an order for the payment of child support or alimony or an order for the right of visitation, by a fíne of not more than five hundred dollars, or imprisonment for not more than three months, or both.
A fine must be made payable to the court, not a party. City of Kenner v. Jumonville, 97-125, 97-210, 97-602 (La.App. 5 Cir. 8/27/97), 701 So.2d 223, 231, 126writ denied, 97-2890 (La.1/30/98), 709 So.2d 718, cert. denied, Jumonville v. City of Kenner, 524 U.S. 953, 118 S.Ct. 2371, 141 L.Ed.2d 739 (1998).
The relief sought by the mover and granted by the trial court, payment of the mover’s attorney’s fees, is not authorized under La.C.C.P. art. 227 and La.R.S. 13:4611(l)(d). Rogers v. Dickens, 06-0898, p. 13 (La.App. 1 Cir. 2/9/07), 959 So.2d 940, 948-49.
We find the reasoning of the Jumonville court persuasive. In that case, the contempt judgment ordered the property owners to pay $1,000.00 in “penalties” to the city. The court found that the record and judgment were clear that the “penalty” was a “fine” for the act of contempt and amended the judgment to reflect a fine payable to the court. 97-125 at 14-15, 701 So.2d at 226-27, 231. Thus, the trial judge’s reference in the present case to “attorney’s fees” does not end the inquiry. We must determine from the record and judgment whether the attorney fee award was actually a fine.
In In re Succession of Horrell, 07-1533 (La.App. 4 Cir. 10/1/08), 993 So.2d 354, 366-67, writs denied, 08-2880, 08-2889 (La.3/6/09), 3 So.3d 482, the Fourth Circuit amended the portion of the judgment awarding the monetary payment to the attorneys to reflect that the payment was actually a fine payable to the Orleans Parish Civil District Court.
Here, the trial judge rendered the judgment ordering Marybelle, Cynthia, and Claudette to pay $250 in “attorney fees” “because of their contemptuous behavior.” La. R.S. 13:4611 authorizes that amount as a fine. Thus, the trial judge intended to punish for the contempt in an amount allowable under the statute. We find, as in Jumonville and In re Succession of Horrell that the “attorney fees” was actually a “fine” for the acts of contempt.
_J_2jFor these reasons, the portion of the judgment awarding $250 in “attorney fees” is amended to reflect that the payment is actually a fine. The fine is made payable to the Civil District Court.

Conclusion

Accordingly, for the reasons stated, ap-pellee’s motion to dismiss the appeal is granted in part to dismiss the appeal from the amended consent judgment and otherwise denied. The contempt judgment is amended to reflect that the $250 in “attorney fees” is a fine for contempt and to reflect that payment by the appellants in the amount of $250 each should be made to the Civil District Court.

MOTION TO DISMISS APPEAL GRANTED IN PART AND DENIED IN PART; APPEAL FROM AMENDED CONSENT JUDGMENT DISMISSED AS 
*71
UNTIMELY; CONTEMPT JUDGMENT AFFIRMED AS AMENDED.

. In the contempt judgment, the trial judge referred to "Claudette Jones Hills" as "Claudette J. Hills” and "Claudette J. Jones.”

. Following the recusal of the Fourth Circuit Court of Appeal judges, the Louisiana Supreme Court transferred the Fourth Circuit appeal to this circuit on January 7, 2010.

. We note that in their appellate brief, the appellants have prayed for attorney’s fees. The appellants, however, have not briefed the request and therefore their request is deemed abandoned. See: Uniform Rules-Courts of Appeal, Rule 2-12.4: "All specifications or assignments of error must be briefed. The court may consider as abandoned any specification or assignment of error which has not been briefed.” Accordingly, we do not address the request. Moreover, appellants cite no statutory authority for such an award.

. La.C.C.P. art. 4551(A) mandates that in a judgment of interdiction, the court shall: (1) Appoint a curator. (2) Appoint an undercurator, unless an undercurator is not required by law. (3) State that the powers of the curator commence only upon qualification. (4) Direct the clerk of court to record the judgment in the conveyance and mortgage records of the parish where it was rendered.

. The Article states:
A. The person appointed qualifies as curator upon furnishing the security required by law and taking an oath to discharge faithfully the duties of his office.
13. (1) If the person fails to qualify for office within ten days from his appointment or within such other period specified by the court, the court on its own motion, or on motion of any interested person, may revoke the appointment and appoint another qualified person.
(2) The delay allowed for qualification may be extended by the court for good cause.
C. The court rendering an interdiction judgment may issue any protective order necessary to protect the interest of the interdict in the interim between the appointment and qualification of the curator.

. La. C.C. art. 397 provides that a "court may modify or terminate a judgment of interdiction for good cause.” And, "interdiction terminates upon death of the interdict or by judgment of the court." Additionally, La. C.C.P.art. 4554 states:
On motion of the court or any person, including the interdict, the court may modify or terminate its judgment when the court finds, by a preponderance of the evidence, that the terms of that judgment are currently either excessive or insufficient or that the ability of the interdict to care for his person or property has so changed as to warrant modification or termination. Except for good cause, the court shall follow substantially the same procedures that apply to an original petition for interdiction before it modifies or terminates an interdiction judgment.
We note that in Interdiction of Galmiche, 97-1112, p. 10 (La.App. 5 Cir. 3/11/98), 708 So.2d 1244, 1247, writ denied, 98-0997 (La.5/29/98), 720 So.2d 668, this court held that "[i]f this route [modification] is chosen it will be necessary to include [the interdict] in the suit.”

. "On appellate review of a criminal conviction, the reviewing court must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient for a rational trier of fact to conclude that every element of the crime of which the defendant was convicted was proved beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Captville, 448 So.2d 676 (La.1984).” State in Interest of R.J.S., 493 So.2d 1199, 1202. "We review a finding of criminal contempt employing the Jackson standard.” State in the Interest of R.J.S., supra, 493 So.2d at 1202.